**DEERE & COMPANY, Plaintiff,**

v.

**INTERNATIONAL HARVESTER COMPANY, Defendant.**

**No. RI–CIV–76–20.**

United States District Court, S. D. Illinois, N. D.

Oct. 19, 1978.

Virgil Bozeman and John Patton, Moline, Ill., Robert H. Fraser and Louis A. Mok, Los Angeles, Cal., Harold V. Harsha, William A. Murray and Raymond L. Hollister, Deere & Co., Moline, Ill., for plaintiff.

Stuart R. Lefstein, Rock Island, Ill., Howard W. Clement, Melvin F. Jager and Thomas G. Scavone, Chicago, Ill., Floyd B. Harman and F. David AuBuchon, International Harvester Co., Chicago, Ill., for defendant.

## DECISION AND ORDER

ROBERT D. MORGAN, Chief Judge.

Jurisdiction in this suit for patent infringement rests upon 28 U.S.C. § 1338(a).

Plaintiff, Deere & Company, is a Delaware corporation having its principal place of business in Moline, Illinois, in this district. Defendant, International Harvester Company, is a Delaware corporation having its principal place of business in Chicago, Illinois. Both parties are manufacturers of agricultural equipment.

Letters Patent No. 3,589,110 was issued June 29, 1971, upon an application by Lester Dale Schreiner and Joseph John Shindelar, to Deere, as assignee of those applicants. It is entitled "Gear Drive and Support for Corn-Harvesting Unit." The complaint alleges that defendant is infringing that patent by its manufacture and sale of its 800 series corn head. Claims 1–10, 14 and 17 are asserted.

In general terms, the patent in suit relates to a corn harvesting mechanism designed for mounting on the forward end of a combine. Such mechanisms are commonly referred to as corn heads. It describes a mechanism embodying a multiplicity of side-by-side row units for the simultaneous harvesting of a multiplicity of parallel rows of corn.

Typically, the spaces intervening between adjacent row units are bridged by sheet metal gatherer points which guide the stalks of corn into the row unit as a combine, with attached corn head, is propelled through a field of corn. Each row unit consists of a pair of gatherer chains, two stripper or deck plates, and two harvesting rolls. As the combine moves through the field, the stalks of corn are guided by the gatherer points and gathering chains into and through a restricted passage between the deck plates. Simultaneously, the counter-rotating harvesting rolls pull the stalks of corn downward between the deck plates. The ears of corn are snapped from the stalk as they reach the restricted deck plate passage, after which the ears are moved rearwardly by the gathering chains into an auger device which, in turn, carries the ears of corn into the combine for processing. After the ears are snapped from the stalks, the stalks are pulled downward through deck plates and out of the mechanism, to remain in the field.

The structure as envisioned by the patent may be briefly described as follows. Each row unit is a self-contained structure encompassing a gear housing upon which the rigid framework of the row unit is attached in cantilever fashion. That housing encloses gears which drive the entire unit, i. e., the gathering chains and the harvesting rollers. The gear housing for each row unit is the means through which such unit is incorporated into the complete corn head. The combine has a transverse beam which extends across a plurality of rows. The structure of the gear housing of each row unit is designed to be detachably secured to the main transverse beam by the use of bolts, and that structure, in turn, carries the unit framework in cantilever fashion.

A main horizontal drive shaft, which is driven by the combine, extends across a plurality of rows to simultaneously drive the number of row units which comprise the corn head.[1] The gear train of each row

---

1. It is generally agreed that corn heads are typically comprised of from two to eight row units for the simultaneous harvesting of a like number of parallel rows of corn.

unit is comprised of a main drive gear rotatable relative to the main drive shaft and thereto connected by a slip clutch which protects the gear train in the event that the unit becomes clogged. The main drive gear activates other gears within the housing which drive the gathering chains and harvesting rolls by means of shafts extending through the gear housing.

Since about 1969 plaintiff has manufactured and sold its 40 Series Corn Head, hereinafter D 40. It is not claimed by the defendant that that embodiment does not exemplify the teachings of the patent in suit.

Since early 1974, defendant has manufactured and sold its 800 Series Corn Head, hereinafter IH 800, which is alleged to infringe the patent in suit.

The D 40 embraces the features and components hereinabove described. The unitary main drive shaft extends across the gross number of row units incorporated in any given corn head. The unit is so constructed that this unitary drive shaft extends through the gear housing on each row unit. The gear housings are fully enclosed. When adjustment for row width is required, it is only necessary to loosen the bolts which lock the gear housing of each row unit to the transverse beam, and then to move the whole unit to right or to left along that beam. The unitary drive shaft is so constructed that the shaft will slide through each gear housing as the unit is moved to right or left. The drive shaft then will engage the main drive gear when the gear housing is resecured upon the transverse beam in the desired position.

It must be found that there is only one distinction between the D 40 and the IH 800. The IH 800 employs a sectionalized drive shaft. A drive shaft unit is rigidly fixed into, and extended through, each gear housing unit. Sectional members in continuation of that shaft are then attached to extend the drive shaft from one row unit to the next and ultimately to achieve a contin-uous main drive shaft coextensive with the total width of the corn head. The IH 800 is spaceable to accommodate the row units to varying row widths by moving the whole row unit along the transverse beam. In the process, the sectionalized main drive shaft must be disassembled and then reassembled by insertion therein of shaft segments which conform in length to the row width desired.

Defendant denies infringement. Defendant also argues that the claimed invention was obvious to persons skilled in the art, in view of the prior art, and also that the claimed invention consists of a combination of old elements which produce no synergistic effect. It therefore contends that the patent should be held to be invalid.

Following a bench trial which produced a voluminous transcript and a large number of exhibits, followed by able briefing by each party and the submission by each of proposed findings of fact and conclusions of law, the cause is now before the court for decision.

The defendant contends that an essential element of the patent is what defendant terms "self-contained adjustability." It contends that the patent claims must be construed to incorporate the element of a single unitary drive shaft extending transversely across the corn head and through each gear box, with the result that adjustment for row width is attained by sliding each gear box transversely along that unitary shaft without interrupting the power train. It contends that its IH 800 series does not infringe because it contains a segmented main drive shaft requiring disassembly of the shaft and reassembly thereof with different components, to achieve adjustment of its unit to accommodate row width.

Plaintiff's response to that contention, in effect, asserts that "self-contained adjustability" is a red herring devised by the defendant with an intent to delude the court

to read into the claims an element which is not therein included.[2]

Analysis of the claims reveals that each party is right, in part. It must be found and concluded that asserted claims 4, 5, 10, 14 and 17, inclusive, are limited in the manner for which defendant contends. It must be further found and concluded that asserted claims 1 through 3, inclusive, and 6 through 9, inclusive, are not so limited.

By way of cataloging the asserted claims, claims 1, 9 and 10, inclusive, are independent claims. Claims 2 through 8, inclusive, are dependent upon claim 1. Claims 14 and 17 are dependent upon claim 10.

Claim 1 defines a corn head as above described, supported forwardly of and on a mobile combine, the combine having a transverse horizontal beam extending across a plurality of corn rows. The inventive improvement is stated to comprise the following elements:

A. A main, rotatable, horizontal drive shaft extending across a plurality of corn rows and supported on the supporting structure;

B. A plurality of corn harvesting units each comprised of:

1. A gear housing adapted to be supported on the transverse beam in a plurality of positions transversely along the horizontal plane of the beam;

2. The gear housing having a portion with a transverse horizontal opening adapted to circumscribe the main drive shaft;

3. A forwardly projecting rigid framework affixed to the gear housing and projecting forwardly and downwardly therefrom;

4. Harvesting mechanism supported on said framework;

5. A gear train within each gear housing, including a main drive gear concentric with the main drive shaft and rotatable relative thereto;

6. The gear train terminating in drive shaft means extending externally from the housing connected to the harvesting mechanism for its operation; and

7. A clutch drivingly connecting the drive gear of each unit to the main drive shaft.[3]

Dependent claims 2 and 3 and 6 through 8, inclusive, each add one or more further limitations to claim 1, those claims being further descriptive of the various elements of the harvesting mechanism.

Independent claim 9 substantially follows the language of claim 1, adding limitations:

1. That the gear housing have "mechanism for supporting the gear housing on the beam";

2. That each unit have a forwardly projecting rigid framework with a rear end

---

**2.** The term does not appear in the patent. It appears, as plaintiff suggests, to have been coined by the defendant.

**3.** Claim 1: "In a corn harvester attachment for harvesting a plurality of rows of corn and supported forwardly of and on a mobile crop-treating unit, the corn harvester having a main supporting structure including a transverse horizontal beam extending across a plurality of corn rows, the improvement comprising: a main rotatable horizontal drive shaft extending transversely across a plurality of rows and supported on the supporting structure; a plurality of crop-harvesting units, with each adapted to harvest a row of corn and with each having a gear housing adapted to be supported on the beam in any of a plurality of transverse positions along the beam whereby transverse spacing between the respective and adjacent harvesting units may be adjusted in accordance

with various spacings between the rows of corn, the gear housing further having a portion with a transverse horizontal opening adapted to circumscribe the transverse drive shaft, and each harvesting unit further having a forwardly projecting rigid framework with a rear end portion fixedly attached to the gear housing and projecting forwardly and downwardly therefrom to a forward end portion; harvesting mechanism supported on the framework and extending between the rear and forward portions thereof; a gear train within each gear housing including a main drive gear concentric with the drive shaft and rotatable relative thereto, the gear train terminating in drive shaft means having drive portions external of the gear housing connected to and for operating the harvest-mechanism; and a clutch drivingly connecting the drive gear of each harvesting unit to the main drive shaft."

portion fixedly attached to the gear housing "to support the framework in cantilever fashion from the rear portion of the housing"; and

3. The "harvesting mechanism supported entirely on the framework and gear housing and extending between the rear end forward portions."[4]

None of those claims can be read to require that the gear housing be transversely movable along the main drive shaft. Both claim 1 and claim 9 describe only a main, rotatable, horizontal drive shaft extending across a plurality of corn rows. Neither limits the shaft to a unitary whole, which is the hallmark of defendant's contention as to self-contained adjustability. Dependent claims 2 and 3 and 6 through 9, inclusive, contain no such limitation.[5] Adopting that concept would require this court to redraft those claims to insert a limitation which is not therein contained, thus restricting all

---

4. Claim 9: "In a corn harvester attachment for harvesting a plurality of rows of corn and supported forwardly of and on a mobile crop-treating unit, the corn harvester having a main supporting structure including a transverse horizontal beam extending across a plurality of corn rows, the improvement comprising: a main rotatable horizontal drive shaft extending transversely across a plurality of rows; a plurality of crop-harvesting units, with each adapted to harvest a row of corn and with each unit having a gear housing, the latter having mechanism for supporting the gear housing on the beam in any of a plurality of transverse positions along the beam whereby transverse spacing between the respective and adjacent harvesting units may be adjusted in accordance with various spacings between rows of corn, the gear housing further having a portion with a transverse horizontal opening adapted to circumscribe the transverse drive shaft, each harvesting unit further having a forwardly projecting rigid framework with a rear end portion fixedly attached to the gear housing to support the framework in cantilever fashion from the rear portion of the housing, the framework projecting forwardly and downwardly from the rear portion to a forward end portion; harvesting mechanism supported entirely on the framework and gear housing and extending between the rear and forward portions; and a gear train within the gear housing including main drive gear means concentric with the drive shaft and drivingly connected therewith, the gear train having drive shaft means with drive portions external of the gear housing connected to and for operating the entire harvesting mechanism."

5. Claim 2: "The structure as set forth in claim 1 in which the forwardly projecting rigid framework includes a pair of laterally disposed plate members that project forwardly from the gear housing and are spaced apart transversely to define a fore-and-aft extending plant passage through which stalks of the row may move and further characterized by the plate members being supported on the gear housing in cantilever fashion whereby the plate members will project forwardly and downwardly to the aforesaid forward end portion of the framework."

Claim 3: "The structure as set forth in claim 1 in which the forwardly projecting rigid framework includes a pair of elongated structural members spaced apart transversely to define a fore-and-aft extending stalk passage with each of the rigid members being supported in cantilever fashion at their rear ends on the gear housing."

Claim 6: "The structure as set forth in claim 1 in which each gear housing has an upper wall portion and a pair of transversely spaced side portions, and each of the rigid frameworks includes a pair of upper laterally disposed plates with rear portions of the plates overlying the gear housing and attached thereto and vertical plate portions depending from the laterally disposed plate portions and lying adjacent the sides of the gear housing and being fixed thereto."

Claim 7: "The structure as set forth in claim 1 characterized by the harvesting mechanism including a pair of forwardly extending gathering chains that is adapted to engage and move corn products rearwardly, and a pair of harvesting rolls positioned beneath the gathering chains, and the rigid framework includes a pair of laterally disposed plates positioned between the respective gathering chains and rolls and are spaced apart transversely to define a stalk passage; and the harvesting mechanism including both the rolls and the gathering chains is driven by the drive portions whereby the drive means for the harvesting mechanism and the framework supporting the harvesting mechanism are supported in and on the gear housing."

Claim 8: "The structure as set forth in claim 1 in which the drive portions include a pair of vertically disposed chain drive shafts and a pair of forwardly and downwardly projecting roll drive shafts, and the harvesting mechanism includes transversely spaced apart gathering chains having their upper ends supported on the chain drive shafts and a pair of transversely spaced fore-and-aft extending harvesting rolls positioned beneath the respective chains and drivingly connected to the roll drive shafts, and the gear train within the gear housing extends from the main drive gear to internal portions of the chain and roll drive shafts."

claims to the preferred embodiment of the invention as described in the specification.

In this context, defendant asserts an action by the Patent Examiner as requiring that all claims be limited in the manner for which it contends. As originally submitted, the application which ripened into the patent in suit contained a total of 21 claims. On September 2, 1970, plaintiff was advised by the Examiner that allowance was subject to an election requirement. In that communication, the Examiner characterized the claims to be grouped as follows:

"I. Claims 1–18 drawn to a plural unit corn harvesting device, *wherein the spacing between the units may be varied, while maintaining the drive therefor*; and

"II. Claims 19–21 drawn to the structure of means for adjusting the speed of an output shaft relative to the drive shaft, independently of the speed of the drive shaft." ˙ (Emphasis supplied.)

He required a restriction between the two groups of claims. In response to that action, plaintiff elected to cancel claims 19 through 21, inclusive, and amended certain of the other group in minor particulars not responsive to the Examiner's requirements. Those amendments have no bearing on the issues in this case. Subsequently, the patent issued containing 18 claims.

Defendant relies upon the Group I language which is emphasized above. It argues that that language reveals that the Examiner considered the Group I claims to be limited to a harvesting unit having a unitary drive shaft, along which the gear housings for row units are slidable for row width adjustment. It also asserts that plaintiff acquiesced in that characterization of the invention by its failure to contest or object to such characterization.

That argument has no merit. All claims had theretofore been approved for allowance. The Examiner's characterization of the Group I claims was descriptive of the preferred embodiment described in the specification, and his action required only an election between what he deemed to be two separate species of claims. Perhaps the most cogent refutation of the merit of defendant's position rests in the fact, as revealed by the file wrapper, that the Examiner did not require limitation of the claims consistent with his characterization.

*Super Products Corp. v. D. P. Way Corp.*, 546 F.2d 748, 757 (7th Cir. 1976), does not support defendant's position. There the court applied the established principle that a patent claim, alone, is the measure of the invention, though the specification and the file wrapper may limit a claim or serve to resolve an ambiguity in it. So stating, the court then said that the specification and file wrapper may not be used to enlarge the monopoly of a claim.

Actually, in this context, what defendant seems to be espousing is an unwarranted expansion of the concept of file wrapper estoppel.[6]

---

**6.** In support of its contention that the invention is limited by the concept of "self-contained adjustability," defendant offered in evidence its exhibits numbered 60, 63, 65, 65A, 66 and 67. Each of those exhibits is an item of correspondence by an agent of plaintiff in support of a Russian patent application correspondent to the United States application. (The Russian application was one of 11 applications filed by plaintiff in various foreign countries.) At the time of trial, those exhibits were admitted in evidence, subject to plaintiff's objections that the same were not relevant.

Those documents do fairly reflect that plaintiff did state in support of its Russian application that the main goal of the invention is the facility of shifting the housing of the gear mechanism; the shifting of the housing upon the drive shaft without couplings, by contrast to the teachings of Ashton (U.S.) 940; and that adjustment requires only the shifting of the gear housing along the main drive shaft and fixing the housing to the transverse beam in its new location.

Plaintiff's citation of *In re Goodman*, 476 F.2d 1365, 1369 (Cust. & Pat. App. 1973), *In re Dulberg*, 472 F.2d 1394, 1398 (Cust. & Pat. App. 1973), and *In re Larsen*, 292 F.2d 531 (Cust. & Pat. App. 1961), is not particularly significant to the question of relevancy. Each of those decisions held that the fact of the issuance of a foreign patent is not relevant to the issue of obviousness under the United States Act. The court in those cases recognized the variation between the foreign laws of patentability and the United States statute, and the variations as between the laws of various foreign countries.

Claim 4 adds to the structure defined in claim 1 a limitation that the gear housing have "a central shaft opening through which the main drive shaft projects with said central opening being considerably larger than the shaft whereby axial movement of the entire gear housing may occur in respect to the main drive shaft."[7] Claim 5 is expressly limited by reference to claim 4.[8]

Claim 10, and each of its dependent claims, has the stated limitation that "the gear housing further" have "transverse opening means for receiving the [drive] shaft to pass therethrough."[9]

The quoted limitations embodied in claims 4 and 10 compel the conclusion that each of those claims is limited to a structure in which the gear housing is transversely movable along a single unitary drive shaft without interruption of the power train. Whatever the semantic merits of defendant's term "self-contained adjustability," that term would seem to be accurately descriptive of the limitations in those claims and in the limitations in dependent claims 5, 14 and 17, inclusive. It must further be found and concluded that claims 1 through 3, inclusive, and 6 through 9, inclusive, if the same be valid, are infringed.

The complaint prays treble damages and attorneys' fees under 35 U.S.C. §§ 284, 285, for wilful infringement. In advance of formal findings of fact, certain narrative com-

---

*Ellipse Corp. v. Ford Motor Co.,* 452 F.2d 163, 169 (7th Cir. 1971), *cert. denied,* 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337, would tend to indicate that the rule applied in the above-cited cases would govern the issue presented by these objections. In *Ellipse,* Ford contended that the patentee had admitted a limitation of its claims by statements made in correspondence which postdated the issuance of the patent in suit. The court said that the meaning which an inventor attaches to his words must be determined by the language of the application, not by subsequent events. In that context, the court adhered to its earlier decision in *Universal Oil Prod. Co. v. Globe Oil & Refining Co.,* 137 F.2d 3, 6 (7th Cir. 1943).

*Jack Winter, Inc. v. Koratron Company, Inc.,* 375 F.Supp. 1, 25, n. 21 (N.D.Cal.1974), does state that a patentee's appraisal of his own invention made in the prosecution of a corresponding foreign application may be relevant to the issue of scope. It is patent in that opinion that either relevancy of the evidence related to the foreign application was shown or that the evidence was produced without objection.

Plaintiff's objections to Exhibits 60, 63, 65, 65A, 66 and 67 are sustained.

Defendant also attempts to find admissions against interest by plaintiff in the file history of the unrelated application which ripened into the Jones 948 patent. The statement of the position refutes it, inasmuch as the Jones application related to an entirely different claimed invention.

7. Claim 4: "The structure as set forth in claim 1 in which the main gear has a hub portion journaled externally on the gear housing and having a central shaft opening through which the main drive shaft projects with said central opening being considerably larger than said shaft whereby axial movement of the entire

gear housing may occur in respect to the main drive shaft."

8. Claim 5: "The structure as set forth in claim 4 in which the hub projects externally of the gear housing, and the clutch includes a first part drivingly connected to the main drive shaft and a second part drivingly connected to the hub with faces of said parts being engageable to effect rotation of the main gear in response to rotation of the main drive shaft."

9. Claim 10: "A corn harvester adapted for support on a combine having a main power source comprising: a housing structure adapted for support at its rear end on the forward end of the combine and projecting therefrom to a forward end; a transverse harvester framework extending forward of and adapted for connection to the forward end of the housing structure, the harvester framework including a transverse horizontal beam extending across a plurality of corn rows; a transverse drive shaft adjacent the beam and also extending across a plurality of corn rows; a plurality of harvesting structures adapted for simultaneous harvesting of a plurality of corn rows, each harvesting structure including a gear housing at its rear end fixedly attachable at various transverse positions on the beam and fore-and-aft extending structural elements cantilevered forwardly from the gear housing and supporting harvesting mechanism thereon, the gear housing further having transverse opening means for receiving the shaft to pass therethrough; drive mechanism within the gear housing including a gear concentric with the shaft with means interjoining the shaft and gear for effecting rotation in unison, the drive mechanism further having portions external of the housing for driving the entire harvesting mechanism of the respective harvesting structure."

ments upon the evidence related to that issue are considered worthwhile.

Prior to plaintiff's introduction of its D 40 corn heads, defendant had inaugurated a program to attempt to design a new corn head to overcome problems which had haunted defendant and others in the industry. No purpose is served by fully delineating the transcript in that regard, except to note that its program had achieved substantially nothing by the end of the year 1969.

Representatives of the defendant saw the D 40 on display, together with a cutaway exhibit of the gear housing and the gear train. Thereafter, one of the defendant's engineers went to the plaintiff's premises and made numerous sketches of the unit, including the power train elements. At a later date, he returned and made more detailed sketches.

The drawings and specifications for the IH 800 culminated from those sketches. Shortly before defendant began production of the IH 800, it sought the opinion of patent attorneys whether its proposed production model would infringe the patent in suit. Its testimony was that it was advised that the unit would infringe if produced with a single unitary drive shaft. Defendant then adopted the segmented shaft, a structure which was old in the art, in an attempt to avoid infringement.

Significantly, also, defendant distributed a sales film promoting its IH 800, which showed its production model with the sectionalized shaft in operation. Defendant's management withdrew that film from use in March, 1976, responsive to a memorandum alluding to the potential of litigation by plaintiff and suggesting that a part of the sound track, if it "inadvertently" fell into plaintiff's hands, "would be all they would need to winning suit." That incident is deemed to be consistent with a finding that defendant knew that it was infringing.

## FINDINGS OF FACT

1. Prior to the inventive concept here embodied, there existed numerous problems with existing corn head structures. The several components, i. e., gathering chains and harvesting rolls, were separately driven, necessitating a main drive gear and drive train for each component. The row units were of a relatively high angle, which added both excess weight to each unit and caused the units to tend to clog, especially in down corn. There was a need for a greater number of row units within a given width of the corn head. The open chain drives then used for the several components required frequent adjustment and maintenance, and they contributed to the problem of clogging. The row units in such corn heads were bulky and heavy, necessitating counterweights on combines in order to maintain steering control.

2. Beginning in 1964, Mr. Shindelar and Mr. Schreiner inaugurated a program to develop a corn head design which would overcome those problems. Their efforts led to the application for the patent in suit and, ultimately, to the issuance of the patent. The principal effects of the concept claimed are as follows. The use of a single main drive shaft to drive the whole unit eliminated one drive gear, made it possible to employ smaller gears, and thereby permitted added compactness of the row unit. The gear housing not only housed the gears, but also served as the sole support for the row unit structure and provided the means by which the harvesting unit was attached to the transverse beam as an integral part of the total corn head. Clutch protection for each row unit was provided, which permitted the reduction in size of the drive components. The cantilevered mounting of the row unit structure upon the gear housing at the rear of the unit eliminated the need for supporting structures beneath the forwardly-extending row unit structure. The corn head sat at a substantially lower angle with relation to the combine to which it was attached. The design permitted the row unit to be more compact, shorter in overall length, narrower, and substantially reduced in weight. The removal of theretofore required support means and the reduced angle substantially decreased the problem of clogging and achieved heightened efficiency in the harvesting of down corn.

3. The D 40 series incorporates the preferred embodiment of the invention as stated in the specification of the patent in suit.

4. In about 1967, defendant inaugurated a program for the purpose of developing a corn head to supplant its then current 700 production series. By early 1969, defendant determined that a redesign of the 700 series would not suffice, but that a completely new design from the ground up would be required. The program was designed to achieve the elimination of excess framework, reduction of weight, and elimination of the drive chains which were, at once, heavy, expensive, and difficult to maintain in proper adjustment. Nothing of moment had been accomplished by the end of the year 1969.

5. In November, 1969, defendant's chief engineer first saw the D 40 corn head. In a subsequent memorandum he characterized the D 40 as "new and rather radical." In January, 1970, Mr. Ralph Sutton, defendant's product engineer in charge of corn heads, first saw the D 40 and a cutaway model revealing the gear train at plaintiff's administrative center. After a second view of that structure, he made a rough sketch of the D 40 gear housing. His reaction to the D 40 was that it was "a hell of a good design." In February, 1970, Mr. Sutton submitted to defendant's chief engineer a memorandum containing certain design proposals for defendant's program. Those proposals included features suggested by his examination of the D 40 structure. Those proposals were eventually adopted by defendant.

6. The design of a gear housing and drive mechanisms was assigned by defendant to a project engineer in February, 1970. On February 14, 1970, that engineer went to plaintiff's administrative center and made sketches of the D 40 gear housing and drive components. He then prepared a sketch of the D 40 unit showing the relationship between the gear case, frame, and gathering components. On February 17, 1970, he again examined the D 40 display, at which time he verified his previous sketches and prepared additional sketches

of the D 40 structure. At a later date, he made an engineering drawing which ultimately led to the IH 800 production series. That drawing incorporated the principal elements and design of the D 40 structure.

7. The IH 800 series was derived from the drawings made, and observations of the D 40 as displayed by plaintiff.

8. The interpretation of the several asserted claims, as hereinbefore set forth in a different context, is found to define the asserted claims and each of them.

9. Each and every element of claims 1 through 3, inclusive, and 6 through 9, inclusive, of the patent in suit is present in the IH 800 series. The sectionalized shaft performs the same function, in precisely the same way, as does the unitary main drive shaft of the D 40, and the same is a main horizontal drive shaft, not distinguishable from the drive shaft set forth in those claims. Nothing in those claims limits them to the main drive shaft remaining uninterrupted in the adjustment mode, i. e., while the row units are being adjusted to achieve any desired row spacing.

10. Claims 1 through 3, inclusive, and 6 through 9, inclusive, are infringed by the IH 800 series corn head.

11. Claims 4, 5, 10, 14 and 17 of the patent are not infringed by the IH 800 corn head. As hereinabove observed, each of those claims is limited to a unitary drive shaft, along which the gear housing may be moved transversely for adjustment of each unit to accommodate varied row widths. None of those claims can be read to include a sectionalized drive shaft, without ignoring limitations stated in the claim itself.

12. The evidence compels the finding that defendant is guilty of wilful infringement of the patent. Prior to the advent of the display of the D 40 by plaintiff, defendant's program to create a new design for a corn head had achieved nothing, except the realization that the problem required something more than the redesign of its then current production series. Within a period of a few months after defendant's engineers first saw the D 40, engineering draw-

ings were prepared by defendant, which led to the IH 800 production series. In the interim, the engineering employee who prepared that basic drawing had made detailed sketches of the D 40 gear housing and drive train. He incorporated the elements of the D 40 therein. By the time when design models of the IH 800 had been manufactured and tested, the patent in suit had issued. When the IH 800 had reached the stage of developing a production series, defendant sought patent counsel's opinion as to the question whether its production series did infringe the patent. Upon advice of such counsel, the segmented drive shaft was incorporated into the production series in an attempt to evade the monopoly of the patent. Segmented drive shafts had theretofore been widely used in the art. A widely distributed promotional film of the IH 800 action included a sound track which extolled the facile adjustability of the row units upon the transverse beam. The IH 800 depicted was equipped with the segmented shaft. In March, 1976, that promotional film was recalled, upon the strength of a letter by defendant's chief engineer, which stated, in effect, that litigation with plaintiff was likely and that the portion of the sound track above summarized would win plaintiff's suit if the information became available to plaintiff. In summary, the trial record permits no doubt that defendant did wilfully appropriate to its own use the teachings of the patent, in reliance upon its hope that segmenting the main drive shaft would avoid a finding of infringement.

13. Nine prior art references were cited to the Patent Office upon plaintiff's application.[10] All are before the court as exhibits. In support of its defense of obviousness, defendant introduced some 22 separate references.[11] Its principal reliance was placed at trial upon the Ariens 348 Patent and the Braud parts manual and related information published by the Braud Corporation in France. The court has reviewed and compared all references submitted to it and finds that the references introduced by the defendant are the equivalent of, and no better than, the prior art references which were before the Patent Examiner. It was only by his use of a number of combinations of the asserted prior art that defendant's expert witness could state the opinion that it would have been obvious to one of ordinary skill in the art to combine such diverse elements into the structure claimed as inventive. His opinion is, of course, contested by the testimony of plaintiff's expert. The trial transcript and exhibits require a finding rejecting defendant's contention.

14. None of the asserted claims of the patent in suit are anticipated under 35 U.S.C. § 102 by any item of prior art which is before the court.

15. The prior art asserted against the asserted claims, either individually or in combination, does not render any of such claims obvious within the intendment of 35 U.S.C. § 103.

16. The asserted claims do produce a synergistic effect through the combination of their elements. Plaintiff's proposed finding of fact that the gear housing is a new element, not an old element incorporated into the total combination, must be rejected. However, synergistic effect is achieved by reason of the fact that old elements were combined in a manner which had the effect of rewriting the book on the

---

**10.** Those references are: Jones U.S. application No. 562,416, later issued as U.S. Patent 3,609,-948; Price No. 1,390,159; Karlson No. 3,101,-579; Ashton No. 3,271,940; Hibbs No. 1,090,-150; Hitchcock No. 1,936,760; Ashton No. 3,520,121; French Patents, Braud, 1,268,615 and 79,932, the latter stipulated to be identical to British Braud Patents 989,114 and 984,356, introduced in evidence by defendant.

**11.** Ariens 2,616,348; Jones 3,609,948; Ashton 3,271,940; Ashton 3,520,121; Dort 2,647,353;

Andrews 2,525,058; Thieman 2,004,711; Schwartz 3,070,939; Claas 3,201,928; Karlson 3,101,579; Dade 2,935,139; Buhr 2,758,555; Argentine Patent 96,525; British Braud 989,-114; British Braud 984,356; Braud (French) parts manual and related documents; John Deere 34 corn head; Massey-Ferguson Parts Manual; IH 40 corn head; IH 41 corn picker; and advertising brochures and materials related to Ariens tillavator.

prior art. The gear housing is, at once, the lubricated environment for the gear train, the whole support for the row unit which extends forwardly therefrom, and it provides the sole support for the row unit as a part of the integrated corn head. The combined effect is the creation of a totally new concept. The effect was to avoid trusses or other supporting means for the row unit and to achieve lateral and vertical compactness of the unit itself.

17. White Motor Company, a competitor of both parties, has recognized the validity of the patent in suit by accepting a license under the patent.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and the subject matter.

2. Plaintiff is, and at all material times has been, the owner of the patent in suit.

■ 3. Measured by legal principles hereinafter concluded, claims 1–10, 14 and 17, inclusive, of the patent in suit are, and each of them is, valid.

■ 4. In determining whether an accused device infringes a valid patent, resort must be had in the first instance to the language of the claim. Infringement is proved if the accused device falls clearly within the claim. *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.,* 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). The accused device must be compared to the claims themselves, not to any particular embodiment described in the specification. *CTS Corp. v. Piher Int'l Corp.,* 527 F.2d 95, 100 (7th Cir. 1975), *cert. denied,* 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748. The claims of the patent measure the invention. They cannot be limited to a preferred embodiment of the invention described in the specification. *E. G., Smith v. Snow,* 294 U.S. 1, 16, 55 S.Ct. 279, 79 L.Ed. 721 (1935).

■ 5. An accused device cannot avoid infringement by merely adding elements if the device embodies each element specified in the claims. *E. g., Temco Elec. Motor Co. v. Apco Mfg. Co.,* 275 U.S. 319, 48

S.Ct. 170, 72 L.Ed. 298 (1928). Nor can infringement be avoided by deliberately impairing the function of one element of the patent claim. *E. g., Technicon Instruments Corp. v. Coleman Instruments, Inc.,* 255 F.Supp. 630, 641 (N.D.Ill.1966), *aff'd,* 385 F.2d 391 (7th Cir. 1967). Infringement is shown when the accused device is substantially the same structure, and if it achieves substantially the same result in substantially the same way. In other words, infringement is shown when the claims read upon the accused device. *E. g., Lewyt Corp. v. Health-Mor, Inc.,* 181 F.2d 855 (7th Cir. 1950); *Nordberg Mfg. Co. v. Woolery Mach. Co.,* 79 F.2d 685, 692 (7th Cir. 1935).

■ 6. Infringement is not avoided by separating a one-piece element into several parts if the element does accomplish the same result in substantially the same way. *Crane Co. v. Aeroquip Corp.,* 504 F.2d 1086 (7th Cir. 1974); *Sutherland Paper Co. v. Auburn Carton Corp.,* 118 F.2d 862 (7th Cir. 1941).

■ 7. The claims are the sole measures of the scope of the invention. *E. g., Aro Mfg. Co. v. Convertible Top Replacement Co., Inc.,* 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961). Neither the specification or drawings limit the claims, *e. g., Binks Mfg. Co. v. Ransburg Electro-Coating Corp.,* 281 F.2d 252 (7th Cir. 1960), *cert. dismissed,* 366 U.S. 211, 81 S.Ct. 1091, 6 L.Ed.2d 239, and a broad claim may not be limited by reading into it a preferred embodiment stated in the specification or limitations expressed in narrower claims. *E. g., Smith v. Snow, supra; Crane Co. v. Aeroquip Corp.,* 504 F.2d 1086 (7th Cir. 1974). A patentee is entitled to broad claims defining his invention, without limitation to a specific embodiment of it.

■ 8. File wrapper estoppel is properly invoked only when the patentee relies upon the doctrine of equivalents and the patentee has obtained allowance of the claims by amending them during prosecution of his application to avoid prior art cited by the Examiner. *E. g., Exhibit Supply Co. v. Ace Patents Corp.,* 315 U.S. 126,

62 S.Ct. 513, 86 L.Ed. 736 (1942); *Ellipse Corp. v. Ford Motor Co.,* 452 F.2d 163 (7th Cir. 1971), *cert. denied,* 396 U.S. 877, 92 S.Ct. 2041, 32 L.Ed.2d 337. The doctrine of equivalents has no application where the claims read literally upon the accused device. *Paper Converting Mach. Co. v. FMC Corp.,* 409 F.2d 344 (7th Cir. 1969), *cert. denied,* 396 U.S. 877, 90 S.Ct. 154, 24 L.Ed.2d 136.

 9. A patent is presumed to be valid by virtue of its having been issued, 35 U.S.C. 282, and that presumption can be overcome only by clear and convincing proof of invalidity. *E. g., Radio Corp. of America v. Radio Eng. Lab., Inc.,* 293 U.S. 1, 54 S.Ct. 752, 78 L.Ed. 1453 (1934); *Laser Alignment, Inc. v. Woodruff & Sons, Inc.,* 491 F.2d 866 (7th Cir. 1974), *cert. denied,* 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113. That presumption cannot be overcome by reliance on prior art when reliance is placed upon prior art having no greater pertinency than that which the Examiner rejected in his allowance of the patent. *E. g., LaSalle Street Press, Inc. v. McCormick & Henderson, Inc.,* 445 F.2d 84 (7th Cir. 1971); *Uarco, Inc. v. Moore Business Forms, Inc.,* 440 F.2d 580 (7th Cir. 1971), *cert. denied,* 404 U.S. 873, 92 S.Ct. 91, 30 L.Ed.2d 117.

 10. A claim cannot be anticipated under 35 U.S.C. § 102 unless all elements of the claim are disclosed in a single prior art reference. *Ace Patents Corp. v. Exhibit Supply Corp.,* 119 F.2d 349 (7th Cir. 1941), *modified on other grounds,* 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736. Anticipation cannot be shown by finding the individual elements separately in prior art. *E. g., Imhaeuser v. Buerk,* 101 U.S. 647, 25 L.Ed. 945 (1880); *Elgen Mfg. Corp. v. Ventfabrics, Inc.,* 207 F.Supp. 240 (N.D.Ill.1962), *aff'd,* 314 F.2d 440 (7th Cir. 1963).

 11. The obviousness or non-obviousness of the subject matter depends upon a comparison of the scope and content of the prior art with the claims in suit, having reference to the level of the ordinary skill in the involved art. Secondary considerations, including, e. g., the proof of a long-felt need and the failure of others to meet that need, may bear relevantly upon the question. *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The presumption of validity is strengthened by evidence of a long-felt need in the art, *e. g., Ekco Products Co., Inc. v. Chicago Metallic Mfg. Co.,* 321 F.2d 550 (7th Cir. 1963), by the failure of others in the art to conceive the invention shown, *e. g., Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc.,* 436 F.2d 1180 (7th Cir. 1971), *cert. dismissed,* 403 U.S. 942, 91 S.Ct. 2270, 29 L.Ed.2d 722; *Devex Corp. v. General Motors Corp.,* 321 F.2d 234 (7th Cir. 1963), and by the defendant's copying of the invention and its praise of the invention through advertising its accused product. *E. g., Ingersoll-Rand Co. v. Brunner & Lay, Inc.,* 474 F.2d 491 (5th Cir. 1973), *cert. denied,* 414 U.S. 865, 94 S.Ct. 125, 38 L.Ed.2d 117; *Chicago Lock Co. v. Tratsch,* 72 F.2d 482 (7th Cir. 1934). Defendant's reliance upon a large number of prior art references is itself an indication that the invention was not obvious. *Minneapolis-Honeywell Regulator Co. v. Midwestern Instruments, Inc.,* 298 F.2d 36 (7th Cir. 1961); *Ric-Wil Co. v. E. B. Kaiser Co.,* 179 F.2d 401 (7th Cir. 1950).

 12. A combination patent is not valid unless the combination of elements achieves a synergistic effect. *E. g., St. Regis Paper Co. v. Bemis Co., Inc.,* 549 F.2d 833, 838 (7th Cir. 1977); *Pederson v. Stewart-Warner Corp.,* 536 F.2d 1179, 1181 (7th Cir. 1976). Synergistic effect is not shown simply by the fact that the combination produces a more striking result. *St. Regis Paper Co. v. Bemis Co., Inc., supra.* A synergistic effect is achieved when the patentee uses and arranges his materials in such fashion that the combination achieves a theretofore unknown concept in the relevant art.

13. Defendant has failed to sustain its burden of proof that the asserted claims are invalid.

 14. When wilful infringement is shown, a court may award damages not exceeding treble the amount of damages

proved, 35 U.S.C. § 284, and in exceptional cases, reasonable attorneys' fees. 35 U.S.C. § 285. This is an exceptional case of wilful infringement.

15. All statements within the total context of this memorandum, which partake of the character of findings of fact, are so found, and all of the same which partake of the character of conclusions of law are so concluded.[12]

16. As a matter of law, plaintiff is entitled to a judgment permanently enjoining the defendant from manufacturing, using, or selling any product embodying the invention claimed in the patent in suit, 35 U.S.C. § 283; for recovery of its provable damages for prior infringement, including interest and costs, which provable damages shall be trebled; and for its reasonable attorneys' fees.

IT IS ORDERED therefore, that judgment shall enter for the plaintiff against defendant:

a. Permanently enjoining defendant from manufacturing, using, or selling any product embodying the invention claimed in the patent in suit;

b. For its provable damages for prior infringement, including interest and costs, which said provable damages are trebled;

c. For its reasonable attorneys' fees and its costs of suit.

The cause shall remain pending for determination of the issue of the amount of damages and the amount of plaintiff's reasonable attorneys' fees, by a subsequent trial of those issues to be set by the court.

---

12. The court has considered all contentions made by the defendant and the authorities by it cited. Any such contentions which are not specifically articulated in the context of this memorandum are rejected.