**INTERNATIONAL HARVESTER COMPANY, Plaintiff-Appellee,**

v.

**DEERE & COMPANY, Defendant-Appellant.**

No. 79–2358.

United States Court of Appeals, Seventh Circuit.

Submitted April 1, 1980.

Decided June 12, 1980.

Rehearing and Rehearing In Banc Denied Sept. 10, 1980.

R. L. Hollister, H. V. Harsha, Deere & Co., Virgil Bozeman, Moline, Ill., Robert H. Fraser, Los Angeles, Cal., Theodore R. Scott, Chicago, Ill., for defendant-appellant.

Howard W. Clement, Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, SPRECHER and CUDAHY, Circuit Judges.

SPRECHER, Circuit Judge.

Plaintiff International Harvester Company (IH) filed suit in the court below seeking a declaratory judgment that its CX–41 corn head does not infringe patent 3,589,110 held by defendant Deere & Company (Deere). The district court granted summary judgment in favor of IH on this claim. Deere appeals from this judgment, urging reversal on two grounds. First, Deere contends that the district court lacked subject matter jurisdiction because this action did not present an actual case or controversy. Second, Deere asserts that even if jurisdiction existed, reversal is warranted because genuine issues of material fact precluded entry of summary judgment. We conclude that the district court erred in denying Deere's motion to dismiss for lack of subject matter jurisdiction and we therefore vacate the district court's order and remand with instructions to dismiss IH's suit without prejudice.

## I

■ The Declaratory Judgment Act, 28 U.S.C. § 2201,[1] provides that federal courts may issue declaratory judgments only in cases of "actual controversy." This requirement is "a jurisdictional prerequisite of constitutional dimension." *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir. 1979) [citation omitted]. The complaint in a declaratory judgment action must allege facts sufficient to establish such an actual controversy. Where the defendant raises factual questions concerning jurisdiction, the court need not accept the allegations of the complaint as true; the court may look behind the complaint and view the evidence to determine whether a controversy in fact exists. *Id.* The plaintiff has the burden of supporting the jurisdictional allegations of the complaint by competent proof. *Id.; Super Products Corp. v. D P Way Corp.*, 546 F.2d 748, 752 (7th Cir. 1976). In deciding whether the plaintiff has carried this burden, the court must look to the state of affairs as of the filing of the complaint; a justiciable controversy must have existed at that time. *Super Products, supra*, 546 F.2d at 752; *American Needle & Novelty Co. v. Schuessler Knitting Mills*, 379 F.2d 376, 379 (7th Cir. 1967).

■ In declaratory judgment actions concerning patents, there are two prerequisites to establishment of an actual controversy. First, the defendant must have engaged in conduct giving rise to a reasonable apprehension on plaintiff's part that it will face an infringement suit or the threat of one if it commences or continues the activity in question. See *Grafon Corp., supra*, 602 F.2d at 783–84; *Super Products, supra*, 546 F.2d at 753. Second, the plaintiff must have actually produced the accused article or have engaged in preparations for production such that

> but for a finding that the product infringes or for extraordinary and unforeseen contingencies, the plaintiff would and could begin production immediately.

1. The Declaratory Judgment Act provides, in pertinent part:

In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201.

*Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc.*, 439 F.2d 871, 875 (1st Cir. 1971) [footnote omitted]. See also *Wembley, Inc. v. Superba Cravats, Inc.*, 315 F.2d 87, 89–90 (2d Cir. 1963). We will examine each of these jurisdictional prerequisites in turn.

### A

 IH had the burden below to adduce facts showing that Deere's statements or conduct created a reasonable apprehension on IH's part that it would face an infringement suit or the threat of one if it continued its activities with respect to the CX–41 corn head. As IH properly notes, resolution of this issue is governed by the liberal approach used in *Super Products, supra,* and *Grafon Corp., supra.* Those decisions establish that an explicit accusation of infringement need not be shown. *Grafon Corp., supra,* 602 F.2d at 784; *Super Products, supra,* 546 F.2d at 753. A plaintiff's reasonable apprehension may be the product of an implied charge of infringement or of a course of conduct which would lead a reasonable man to fear that he or his customers face suit or the threat of suit. *Grafon Corp., supra,* 602 F.2d at 784; *Super Products, supra,* 546 F.2d at 753. This reasonable apprehension, however, must be the product of *defendant's* statements or conduct; a reasonable apprehension alone, if not inspired by defendant's actions, does not give rise to an actual controversy. *Super Products, supra,* 546 F.2d at 753; *Premo Pharmaceutical Laboratories, Inc. v. Pfizer Pharmaceuticals, Inc.*, 465 F.Supp. 1281, 1282 (S.D.N.Y.1979).

 IH's complaint did not allege that Deere explicitly charged, prior to institution of this suit, that the CX–41 infringed its patent. As noted above, such an explicit charge is not required. However, while

> it is not a *necessary* condition to a declaratory action by an alleged infringer that an actual accusation is made, the lack of such an accusation can be and is relevant in determining, along with all other facts, the reasonableness of the alleged infringer's apprehension of infringement litigation.

*Pittway Corp. v. BRK Shareholders' Committee*, 444 F.Supp. 1210, 1213 (N.D.Ill.) [emphasis in original], *aff'd mem.*, 588 F.2d 835 (7th Cir. 1978). It is undisputed that Deere never contacted any of IH's customers or dealers with respect to the CX–41 and IH does not contend its ability to sell the CX–41 has been adversely affected by any actions of Deere. *Plaintiff's Responses to Defendant's First Request for Admissions,* Record, Document No. 17, at 5; *Plaintiff's Answers and Objections to Interrogatory Nos. 1–72,* Record, Document No. 21, at 16, 21, 22–23. It is apparent, therefore, that IH relies upon an implied charge of infringement or upon other statements or conduct of Deere to support its claimed "reasonable apprehension." [2]

IH points to several facts to establish its reasonable apprehension. First, it emphasizes the prior suit between it and Deere involving this patent and the district court's order in that suit enjoining IH from further infringement.[3] Second, on April 3, 1979, IH submitted a partial drawing[4] of the CX–41

---

2. IH, in its brief on this appeal, claims that it had a reasonable apprehension of patent litigation or the threat of such litigation. It is relevant that nowhere in its complaint did it allege that it had a reasonable apprehension; it merely alleged certain facts and then concluded, "[t]herefore, there is a justiciable controversy." We agree with the court in *Pittway Corp., supra,* 444 F.Supp. at 1214 n. 6, that the absence of such an allegation in the complaint is a factor to be considered in evaluating the jurisdictional issue. In addition, the complaint did not allege that Deere had charged IH with infringement with respect to the CX–41.

3. In *Deere & Co. v. International Harvester Co.*, 460 F.Supp. 523 (S.D.Ill.1978), the court found Deere's patent valid and infringed by IH's 800 series corn head. On appeal, this court reversed that judgment and remanded for further proceedings. No. 78–2660 (unpublished memorandum issued January 23, 1980). In particular, this court found the district court's conclusion that the patent was valid to be defective.

4. It is undisputed that the one-page sketch did not depict a complete corn head. The letter sent with the drawing informs Deere that it may "assume all other limitations of the Schreiner claims are readable on the CX–41 Corn Head." Defendant's Appendix at 61.

to Deere and requested Deere's confirmation that it did not infringe Deere's patent; Deere was informed that if it refused to take a position or concluded that the CX–41 did infringe, IH would seek judicial relief. Defendant's Appendix at 61–62. Deere responded by letter on April 19, 1979:

I have reviewed your letter of 3 April 1979 concerning your proposed replacement for the IH 800 corn head with our management.

While a discussion of possible alternative designs would undoubtedly be appropriate in the context of an overall settlement of the dispute between us, we are not prepared to deal with this issue separately.

Defendant's Appendix at 63. Finally, IH alleges that on May 8, 1979, an officer of Deere advised IH that Deere would permit production of the CX–41 "for the payment of money . . . ." Affidavit of F. David AuBuchon, ¶ 4. See Complaint, ¶ 11. Deere denies this allegation; the other facts are undisputed. It is also undisputed that Deere in no way requested or solicited the CX–41 drawing.

 The pending litigation between Deere and IH is of some relevance. It indicates that under certain circumstances, Deere will pursue patent infringement litigation to defend against what it perceives as infringement of its patents. It does not indicate, however, that Deere would pursue a patent suit with respect to the CX–41 or that Deere had formed any opinion as to whether the CX–41 infringed its patent. The CX–41 was in no way involved in the prior suit and thus that suit cannot be viewed as anything more than a general indication that Deere considers litigation a viable alternative once it has determined that a competitor is producing a product which infringes the patent at issue here. See *TRW v. Ellipse Corp.*, 495 F.2d 314, 318–20 (7th Cir. 1974); *Walker Process Equipment, Inc. v. FMC Corp.*, 356 F.2d 449, 451 (7th Cir.), *cert. denied*, 385 U.S. 824, 87 S.Ct. 56, 17 L.Ed.2d 61 (1966).

IH relies heavily on *Broadview Chemical Corp. v. Loctite Corp.*, 417 F.2d 998 (2d Cir.

1969), *cert. denied*, 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1970), as support for its emphasis on the prior suit. In the abstract, *Broadview* does lend some support to IH's position; however, the facts in *Broadview* readily distinguish it from the instant case. In *Broadview*, a patent suit between the parties had been resolved by consent decree. Broadview then developed a new formula. Loctite considered the new formula an infringement and successfully sued Broadview for violation of the consent decree, obtaining an injunction against further infringement applicable to Broadview and its customers having knowledge of the injunction. *Id.* at 1001. Loctite then sent letters to Broadview's customers informing them of the decree and injunction. The customers were also informed that Broadview was incapable of developing a noninfringing formula and that Loctite would sue any infringers. After developing still another formula, Broadview sought a declaratory judgment. The only similarity between *Broadview* and the instant action is the prior patent suit between the parties. Even that similarity is limited because the prior suit in *Broadview* had been finally resolved and an injunction had issued; the prior suit here is still pending and the injunction which initially issued had been stayed. We note also that the prior litigation between Broadview and Loctite did not alone establish a reasonable apprehension, even though the court characterized it as "fierce"; the court relied heavily upon Loctite's threats against Broadview and its customers. *Id.* at 999–1000. The injunction and consent decree were considered by the Second Circuit primarily with respect to whether it should exercise its discretion to take jurisdiction after an actual controversy had been shown. *Id.* at 1000–01. IH cites no case, and our research has disclosed none, in which a prior patent suit was of controlling weight in establishing a reasonable apprehension. Even under circumstances as aggravated as those in *Broadview*, a prior suit is but one factor to be considered; we will treat it as such here. See also *Sherwood Medical Industries, Inc. v. Deknatal, Inc.*, 512 F.2d 724, 728 (8th Cir. 1975).

IH's April 3, 1979, submission to Deere is of little, if any, significance. IH cannot require Deere to review its designs for possible patent infringement and Deere's refusal to grant patent clearance cannot create a reasonable apprehension. Deere's response of April 19, 1979, cannot be construed as anything other than refusal to take a position. Deere was entitled to treat IH's request in this manner. IH's argument would result in a requirement that a patentee grant clearance to a competitor's designs upon request or, by its refusal to do so, create declaratory judgment jurisdiction. A reasonable apprehension could thus be created by a patentee's refusal to act. That is not the law and we decline to establish the rule for which IH argues. Even where a patentee initiates contact by requesting a sample of the product in order to examine it for possible infringement, a reasonable apprehension is not created. See *American Needle & Novelty Co. v. Schuessler Knitting Mills*, 379 F.2d 376, 379 (7th Cir. 1967). It is clear that IH's unsolicited demand that Deere admit noninfringement or face suit coupled with Deere's noncommittal response could not have created a reasonable apprehension on IH's part.[5]

Finally, IH relies upon its allegation that Deere, apparently as a further response to the April 3 correspondence, stated that it would permit IH to produce the CX–41 upon payment of money. IH characterizes the statement as a demand for royalties under the Deere patent; since Deere presumably would not demand royalties if it did not believe the CX–41 was covered by its patent, IH maintains that the statement is tantamount to a charge of infringement. IH cites our decision in *Sticker Industrial Supply Corp. v. Blaw-Knox Co.*, 367 F.2d 744 (7th Cir. 1966), in support of its position that this statement was sufficient to create a reasonable apprehension. *Sticker* is, however, distinguishable on its facts. In that case, potential customers of Sticker were contacted by Blaw-Knox and informed that Blaw-Knox had recently been issued the patent and that licenses under it were available. Sticker established that it had lost specific sales because this notice had made potential customers fearful of infringement suits. Furthermore, an earlier letter from Blaw-Knox to Sticker had indicated that Blaw-Knox believed Sticker's installation would infringe its patent, when issued. In the present case, there has been no contact between Deere and customers of IH; IH does not contend that Deere's actions have resulted in lost sales or impaired IH's ability to make future sales; and Deere did not explicitly state, prior to this litigation, that the CX–41 infringed or might infringe its patent. The statement which IH points to as a demand for royalties and thus a charge of infringement mentions neither royalties, nor infringement, nor the Deere patent at issue.[6] In fact, IH's complaint does not even allege that it interpreted the statement as a demand for royalties. We do not believe that this ambiguous statement, without more, will support IH's claim of reasonable apprehension.

The facts identified as crucial by IH all have been considered in various cases

---

5. In its brief, IH suggests:
The debate over whether Deere had taken a position at the time of filing the Complaint seems somewhat superfluous in view of Deere's present insistence that the CX–41 infringes.
Brief for Plaintiff-Appellee at 29. This indicates a misunderstanding of the relevant legal principles. Far from being superfluous, Deere's position at the time of filing the complaint is central to the jurisdictional inquiry. A claim of infringement made as part of its defense in this suit does not affect Deere's contention that jurisdiction did not exist when suit was filed. See *American Needle, supra*, 379 F.2d at 379.

6. Two references to this statement appear in the record. Both indicate only that on May 8, 1979, Deere stated to IH that Deere would permit production of the CX–41 for the payment of money. See Affidavit of F. David AuBuchon, ¶ 4; Complaint, ¶ 11. The manner in which the complaint and affidavit are drawn could lead to an inference that the statement was in response to the April 3, 1979 correspondence; this connection is not, however, expressly alleged.

to be indicative of whether an actual controversy existed between the parties. In every case cited by IH and in every case our research has disclosed, however, the facts upon which IH relies here were only part of a far more extensive factual pattern giving rise to the plaintiff's reasonable apprehension. This extensive factual pattern is totally lacking in this case. IH has established only that Deere's patent is the subject of another suit pending between the parties and that Deere, in response to an unsolicited demand for patent clearance, made one statement refusing to take a position and another, apparently oral, indicating that IH could produce the CX–41 if Deere were paid an unspecified sum of money. Weighed against these facts are the absence of an explicit accusation of infringement, the absence of any contact between Deere and IH's customers and dealers, and IH's admission that it does not contend that Deere has in any way impaired its ability to sell the CX–41. We also note that IH initiated communications with respect to the CX–41 and, indeed, was first to suggest that its design might raise a question of infringement. We have found no case in which a plaintiff demanded patent clearance from a competitor and was able to rely upon the refusal to grant it as a basis for its reasonable apprehension.[7] The question of jurisdiction in such cases is a matter of degree to be considered in light of business reality. Our examination of the pleadings and evidence submitted below

convinces us that IH failed to establish a justiciable controversy by competent proof. IH failed to show that it had, at the time of suit, a reasonable apprehension of suit or the threat of suit inspired by conduct or statements of Deere.

IH emphasizes the liberal interpretation this court has placed upon the "reasonable apprehension" requirement and points to *Super Products, supra,* as the prime example of that approach. However, comparison of the facts established in *Super Products* with those adduced here reveals the weakness of IH's case, even when viewed liberally. In *Super Products,* officers of D P Way stated to prospective investors and customers of Super Products that D P Way would sue any competitor, including Super Products, which infringed its patent. 546 F.2d at 753–54. This alone was insufficient to establish a reasonable apprehension. It was only when D P Way's stated determination to defend its patent was viewed in conjunction with the virtual identity of Super Products' machine and the patented device that this court was willing to find a reasonable apprehension. In the present case we have neither a specific statement on patent defense by Deere to IH or its customers nor virtual identity of products. It is undisputed that the CX–41 does not literally infringe; it is only through the doctrine of equivalents that Deere was able to state an infringement claim in this suit.[8] *Super Products* indicates that

7. In every case uncovered in our research in which an actual controversy was found, the patentee was the first to raise the question of possible infringement. See, e. g., *Grafon Corp., supra,* 602 F.2d at 784; *Super Products, supra,* 546 F.2d at 752; *Broadview Chemical, supra,* 417 F.2d at 999; *Sherwood Medical Industries, supra,* 512 F.2d at 726, 728. Only two cases were found in which the potential infringer initiated contact; in both it was held that no actual controversy existed. In *Premo Pharmaceutical, supra,* the plaintiff requested a license from the patentee; when the request was refused, it filed suit. 465 F.Supp. at 1283. In *Wembley, Inc. v. Superba Cravats, Inc.,* 315 F.2d 87 (2d Cir. 1963), the plaintiff sent a sample of its product to the patentee and requested that it agree that the product did not infringe. The suit was dismissed because plaintiff did not intend immediately to undertake manufacture

of the product; the court thus did not decide whether plaintiff had a reasonable apprehension.

8. The facts in *Grafon Corp., supra,* were even more compelling than those in *Super Products.* The plaintiff in *Grafon Corp.* established that the defendant had contacted plaintiff's customers and told them plaintiff had no rights to the product. Plaintiff showed that defendant's statements induced specific customers not to make purchases and that defendant tried to persuade other customers not to buy from plaintiff. 602 F.2d at 784. In addition, the complaint in *Grafon Corp.* alleged that defendant had charged plaintiff with infringement and had demanded that plaintiff discontinue production. *Id.* at 782. No such allegations were made in the complaint in this case.

while alleged infringers need not wait until they are sued for infringement or until an actual "accusation" of infringement is made to establish their rights by way of the declaratory judgment device, they may not obtain declaratory relief when there is no real threat of infringement litigation by the patentee.

*Pittway Corp., supra,* 444 F.Supp. at 1213. IH has not shown that there was any real threat of infringement litigation by Deere with respect to the CX–41.

## B

Having determined that IH failed to establish that Deere instilled in it a reasonable apprehension of suit or the threat of suit, we need not consider the second element of the jurisdictional test described above. We address it here, however, because we believe it provides an alternative basis for the conclusion reached in Part I, A, *supra.*

It is clear that a declaratory judgment plaintiff need not have engaged in actual manufacture, use or sale of a potentially infringing product in order to seek a declaratory judgment of noninfringement or patent invalidity. *Super Products, supra,* 546 F.2d at 754. It is equally clear, however, that

where there is no actual manufacture, use, or sale, and no immediate intention and ability to practice the invention, there is no justiciable controversy.

*Wembley, Inc. v. Superba Cravats, Inc.,* 315 F.2d 87, 90 (2d Cir. 1963). The federal courts do not render advisory opinions on patent matters. Therefore, the " 'definite' intention of the plaintiff to take 'immediate' action" with respect to the potentially infringing product must have existed when suit was filed; "this intention should be 'evident' from the preparatory steps outlined in its complaint." *Id.* at 90; *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc.,* 439 F.2d 871, 875 (1st Cir. 1971). In our most recent consideration of this issue,

in *Super Products,* we cited *Wembley* and *Sweetheart Plastics* with approval in finding

an apparent ability and a definite intention on the part of plaintiff to manufacture and sell a product similar to the one described in defendant's patent . . .

*Super Products, supra,* 546 F.2d at 753.[9] Whether the requisite apparent ability and definite intention have been established is necessarily a question of degree which must be resolved on a case-by-case basis. *Id.*

The complaint in this action does not outline IH's preparations for production of the CX–41 in any detail. The complaint alleges:

IH has developed and field tested its CX–41 corn head. * * * IH presently plans to begin production of the CX–41 in early 1981. Because of the extended lead time required in the production of such devices, in order to meet this timetable, it is necessary that IH immediately confirm that the CX–41 is not an infringement of the patent in suit.

Complaint, ¶ 10. To give substance to these allegations, we must examine the depositions and other evidence presented below.

The record reveals the following facts concerning the status of the CX–41 project as of May 25, 1979, the date IH filed suit. Development of a new corn head proceeds in three stages: basic design, testing, and production, including revised tooling. The CX–41, as of May 25, 1979, had gone through basic design and had entered the testing stage. The testing stage apparently consists of laboratory and field testing. McMillen Deposition at 44–45. As of May 25, 1979, one gear case had been subjected to 1500 hours of laboratory testing. *Id.* at 44, 109–10. IH planned to test a total of six gear cases in this manner and believed that a minimum of three should be so tested; thus, at least two more gear cases were to be laboratory tested. *Id.* at 109–10. In

---

9. In addition to this apparent ability and definite intention, we found, in *Super Products,* a business enterprise specifically directed to pro-
duction of a potentially infringing product. 546 F.2d at 753.

Autumn 1978, a unit containing some CX–41 components was field tested and, in Spring 1979, a complete CX–41 model was field tested for three months in Australia; no complete CX–41 was field tested in the U.S. prior to May 25, 1979. *Id.* at 42–44. IH expected the testing stage to continue into the next year. Olmsted Deposition at 92–93. IH generally considered a full-season test necessary before release of a corn head for production and believed that a considerable number of experimental corn heads should go through a full-season test prior to release. *Id.* at 95–96.[10] It is undisputed that the testing could result in further design changes to correct weaknesses revealed by the tests. McMillen Deposition at 40–41. See also Olmsted Deposition at 92–93. Design changes, however, are possible even after a machine goes into commercial production.

The record also reveals actions which IH had not yet taken with respect to the CX–41. No production CX–41 had been built, although a complete experimental model had been constructed; no production parts had been made; IH had provided no description of the CX–41 to its dealers or customers nor had it begun efforts to solicit orders; no maintenance manuals, operator's manuals or advertising materials had been compiled; and tooling was in its early stages.

It is apparent that as of May 25, 1979, IH anticipated further, fairly extensive testing of the CX–41, including construction of more test models, and anticipated design changes where necessary in response to the testing. IH evidently did not believe that the project was sufficiently advanced to warrant beginning significant efforts directed at manufacturing and marketing the CX–41 as a commercial product. Its efforts as of May 25, 1979, had been primarily confined to design and testing. IH had spent $900,000 on basic design and partial testing prior to filing suit; it expected to spend an additional $400,000 before release for production and $3 million on tooling before production could begin. Brief for Plaintiff-Appellee at 8–9.

■ We note initially that Deere's contention that IH is likely to abandon the CX–41 if IH prevails in the other suit is unsupported by the record and is amply refuted by the affidavits and depositions. Our concern is not that the CX–41 will never be produced, but rather that because of the relatively early stage of its development, the design which is before us now may not be the design which is ultimately produced and marketed. For a decision in a case such as this to be anything other than an advisory opinion, the plaintiff must establish that the product presented to the court is the same product which will be produced if a declaration of noninfringement is obtained. IH has failed to make this showing. IH has asserted that the CX–41 design is finalized insofar as relevant to Deere's patent. This assertion, however, is unpersuasive. The depositions indicate that where testing reveals a weakness or flaw in design, changes are made. In view of the significant amount of testing still to be conducted as of May 25, 1979, it could not be said with assurance that no "relevant" design changes were possible.[11]

---

**10.** William Forsberg, an IH product designer, agreed that further field testing of the CX–41 was necessary. Forsberg Deposition at 47. He then testified that he had full confidence in the CX–41 and would not hesitate to expedite its release for production. His testimony, however, is unclear as to the amount of additional testing he considered necessary. *Id.* at 47–51.

**11.** IH emphasizes the fact that design changes are possible even after a corn head has been commercially distributed, apparently in an effort to minimize the significance of the possibility of changes prior to production. This argument misses the point. Once a product has been distributed, the question of possible patent infringement becomes concrete; despite subsequent design changes, an actual controversy can exist regarding infringement by the product as of the time of distribution. Prior to production, however, design changes are important because there has been no potentially infringing action giving rise to a concrete controversy. The existence of an actual justiciable controversy depends upon the definiteness of the plaintiff's intention to produce a particular product which presents a question of possible infringement.

Furthermore, while some aspects of the CX–41 design may be clearly irrelevant to the Deere patent, it is for the court, not plaintiff, ultimately to determine which elements of the CX–41 design are relevant to the question of infringement.

It is because of this desire to void rendering advisory opinions that the federal courts have required that a declaratory judgment plaintiff's preparations for production have proceeded to the point where it is about to infringe or take some other action prejudicial to the interests of the patentee. See *Super Products, supra,* 546 F.2d at 754; *Wembley, Inc., supra,* 315 F.2d at 90. The declaratory judgment device enables a plaintiff to obtain a decision on the infringement question without requiring him to incur the expenses of actual production or the risk of infringement liability, *Wembley, Inc., supra,* 315 F.2d at 90; it is not, however, intended to shield the plaintiff from all risks and expenses involved in designing and developing a new product. Whether the standard is expressed as "an apparent ability and a definite intention on the part of plaintiff to manufacture and sell a product . . .," *Super Products, supra,* 546 F.2d at 753, or as "plaintiff has the immediate intention and ability of entering into actual manufacture, use or sale of the article . . .." *Sweetheart Plastics, supra,* 439 F.2d at 875, it is clear that the plaintiff's preparations for production must have proceeded to the point at which any further action might prejudice the interests of the patentee. IH has failed to establish that, as of May 25, 1979, the CX–41 project had proceeded to this point.

IH asserts that the facts in this case are more compelling than those in *Super Products, supra,* in which a justiciable controversy was found. We disagree. There was no suggestion in *Super Products* that any design changes were likely or even possible. In addition, the uncontroverted facts established:

> By the time the complaint was filed, [plaintiff] had developed a general design for an industrial vacuum cleaner with plans for nine models. It was offering a description of the machine and its various models to prospective customers and was actively soliciting orders for them. The plaintiff was in the process of building parts for the machine.

*Super Products, supra,* 546 F.2d at 752. It is clear that the plaintiff in *Super Products* had gone far beyond design and development of its product and was involved in marketing and solicitation activities and active preparations for commercial production. In fact, this court found that the plaintiff

> was faced with a choice of either incurring potential liability for infringement of the defendant's patent or abandoning an existing business enterprise.

*Id.* at 754–55. IH was not nearly faced with this choice as of May 25, 1979. The facts established by IH in this suit fall far short of those established in *Super Products* and indicate that IH's preparations prior to filing suit had not advanced to the stage at which a justiciable controversy would be established. Because dismissal is without prejudice, IH may file suit again when its preparations have reached a later stage.

C

There is yet another basis upon which the decision reached above may be supported. It is well established that declaratory judgment jurisdiction is discretionary; even where a justiciable controversy has been shown to exist, federal courts have discretion to decline to exercise their jurisdiction. See *TRW v. Ellipse Corp.,* 495 F.2d 314, 322 (7th Cir. 1974); *Broadview Chemical, supra,* 417 F.2d at 1000–01. A court of appeals, in deciding whether discretion should be exercised to decline or accept jurisdiction in a particular case, does not defer to the judgment of the district court; the court of appeals must exercise its own sound discretion as to the propriety of the grant or denial of a declaratory judgment. *Broadview Chemical, supra,* 417 F.2d at 1000; *Hanes Corp. v. Millard,* 531 F.2d 585, 591–92 (D.C.Cir.1976).

In this case we believe that even if IH had successfully carried its burden of establishing a justiciable controversy, declaratory judgment relief would not be appropriate at this time. A declaratory judgment should issue only when it will serve a useful purpose. *Hanes Corp., supra,* 531 F.2d at 592. Because of the current status of the prior patent suit between Deere and IH, there is a distinct possibility that the declaratory judgment sought here by IH would not serve a useful purpose. Our reversal of the prior suit reopened the question of the validity of the patent which is at the heart of both suits. If that patent ultimately is found to be invalid, this entire lawsuit becomes unnecessary because, whatever its final configuration, the CX–41 could not possibly infringe a nonexistent patent.[12] Thus, the pending suit may make resolution of the issues presented by this declaratory judgment suit unnecessary. This is an appropriate basis on which to decline to exercise our discretionary jurisdiction. See, e. g., *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc.,* 439 F.2d 871, 875 (1st Cir. 1971); *TRW, supra,* 495 F.2d at 322–23. Cf. *Hanes Corp., supra,* 531 F.2d at 594 n. 7, 600 (appropriate to defer consideration of issues presented in declaratory judgment suit where submission of a dispute to arbitration might render consideration of those issues unnecessary).

In exercising its discretion, a federal court must consider the public interest and the plaintiff's need for the requested relief. See *Hanes Corp., supra,* 531 F.2d at 592; *Broadview Chemical, supra,* 417 F.2d at 1001. We believe that, in view of the present status of the CX–41 project and the pending patent suit between these parties, IH's need for declaratory relief does not outweigh the interests in judicial expediency and in avoiding unnecessary federal court decisions. Much of the uncertainty which IH asserts is in need of resolution was created by the district court decision in the prior suit, a decision which is now being reconsidered. The possibility that the uncertainty will be resolved by a final decision in that case convinces us to decline jurisdiction, if it exists, in this case.

We are further influenced by the lack of actual harm to IH. We are aware of the difficulty presented when a substantial investment is made in a product which might be found to infringe a competitor's patent. However, in this case development of the CX–41, at least in terms of actual investment vis-à-vis anticipated investment, was still in a relatively early stage. IH also does not contend that Deere has in any way impaired its ability to market the CX–41 once it is ready for commercial production. In addition, the injunction which issued after the initial order in the prior suit has been stayed pending final resolution of that suit. Because dismissal of this suit is without prejudice, IH is free to seek a declaratory judgment in the future, assuming it can establish jurisdiction, when its need for relief is more compelling.

## II

Because we find that the district court lacked subject matter jurisdiction, we do not reach the other issues raised by Deere on appeal and argued in the briefs. We express no opinion as to whether genuine issues of material fact precluded entry of summary judgment in favor of IH or whether Deere is estopped by its position in the prior suit from claiming that the CX–41 infringes its patent. We also decline to reconsider our denial, on February 8, 1980, of IH's Motion to Strike portions of Deere's brief.

Accordingly, we vacate the district court's order and remand the case for dismissal without prejudice. Because the dismissal is without prejudice, IH is free to seek a declaratory judgment that the CX–41 is noninfringing at a time when it can

12. This point is underscored by evidence in the record which reveals that development of the CX–41 was shaped, at least in part, by Deere's initial victory in the prior suit. We note that an ultimate victory for IH in that suit on the issue of patent validity renders the instant suit unnecessary even though the record reveals that the CX–41 will be produced regardless of that result.

carry its burden of establishing an actual controversy as to that issue between itself and Deere.

Vacated and Remanded.

CUDAHY, Circuit Judge, concurring.

I concur in the result but would prefer to rely solely upon certain of the grounds cited in Part I "C" of the majority opinion. It is true, as the majority there suggests, that another pending lawsuit, involving the alleged validity and infringement of Deere's patent vis-à-vis IH's 800 series corn head,* may eventually render the instant suit superfluous. As Judge Sprecher notes,

> If [Deere's] patent ultimately is found to be invalid, this entire lawsuit becomes unnecessary because, whatever its final configuration, the CX–41 could not possibly infringe a nonexistent patent.

It also seems true that the injunction issued by the district court in the other pending case provided one of the more compelling reasons for IH to seek relief in this one. But that injunction is now stayed pending final resolution of that suit thus removing any threat of possible contempt.

With respect, however, to the existence here of a "case or controversy," although Judge Sprecher has ably and eloquently presented the arguments against the existence of an "actual controversy," I fear that the result of his efforts may be to substitute a spate of litigation about justiciability for litigation about infringement. Absent the special circumstances of this case (noted above), the need for as much certainty as reasonably possible in the marketing of new products and technology suggests, in the present context, a generous construction of the Declaratory Judgment Act.

---

* *Deere & Co. v. International Harvester Co.,* 460 F.Supp. 523 (S.D.Ill.1978); *rev'd and rem'd* for further proceedings, No. 78–2660 (unpublished memorandum issued January 23, 1980).