**INFINITECH, INC., Plaintiff,**

v.

**VITROPHAGE, INC., Defendant.**

**No. 93 C 2846.**

United States District Court,
N.D. Illinois, E.D.

Jan. 19, 1994.

---

Daniel A. Cummings, Mary T. Meegan, Rothschild, Barry & Myers, P.C., Chicago, IL, Marc S. Gross, Bryan, Cave, McPheeters & McRoberts, New York City, Randy R. Mariani, Bryan Cave, Bryan, Cave, McPheeters & McRoberts, St. Louis, MO, for plaintiff.

Don H. Reuben, Robert Walter Tarun, Hal B. Merck, Winston & Strawn, Chicago, IL, Ron E. Shulman, Gerald J. Flattmann, Fish & Neave, New York City, William G. Swindal, Hinshaw & Culbertson, Chicago, IL, for defendants.

## MEMORANDUM OPINION

GRADY, District Judge.

The defendant, Vitrophage, Inc. ("Vitrophage") has moved for dismissal of the plaintiff's First Amended Complaint under Fed. R.Civ.P. 12(b)(1) for lack of jurisdiction over the subject matter of the action. For the reasons explained in this opinion, the court denies the motion.

## BACKGROUND

The plaintiff, Infinitech, Inc. ("Infinitech") has filed a complaint seeking a declaratory judgment, invoking the court's discretionary jurisdiction under 28 U.S.C. § 2201. Infinitech asks the court to declare that it had intervening equitable rights, under 35 U.S.C. § 41(c), in its development of a liquid perfluorocarbon product for use in retinal surgery. Infinitech's First Amended Complaint ("the Complaint") also asks the court to declare unenforceable the United States Letters Patent No. 4,490,351 ("the '351 patent").

The defendant, Vitrophage, is the current holder of the '351 patent, granted by the United States Patent and Trademark Office ("the PTO") on December 25, 1984. The patent applies to certain liquid chemical compounds, known as perfluorocarbons, that retinal surgeons use during surgery as substitutes for fluids in a portion of the eye. Under the authority of 35 U.S.C. § 41, the PTO charges nominal maintenance fees to keep patents in force. The fees are due on specific dates tied to the date the patent was issued, and the statute provides for a six-month "grace period" for late payment. 35 U.S.C. § 41(b). In this case, a fee for main-

taining the '351 patent was due June 25, 1988, with a grace period until December 25, 1988. For reasons that apparently are in dispute, neither Vitrophage nor its predecessors in interest paid the fee, and the grace period expired. On June 13, 1990, Vitrophage's counsel wrote his client and stated that "[w]ith respect to the U.S. patent, there is no chance, in my opinion, of revival at this late date." Plaintiff's Memorandum in Opposition, Affidavit of Marc S. Gross, Exhibit A1.

Subsequently, in 1990 and 1991, Infinitech and its predecessor in interest began to develop a liquid perfluorocarbon product known by the trademark name of Perfluoron. In the meantime, the then-holder of the '351 patent petitioned the PTO for reinstatement of the patent, and on May 15, 1991, the PTO reinstated the patent and accepted delayed payment of the maintenance fee. Then the fur began to fly.

Vitrophage's counsel "notified Infinitech with respect to infringement" of the '351 patent as early as June 13, 1991, and Vitrophage subsequently referred to Infinitech's application for FDA approval of Perfluoron as "an act of infringement" in a letter dated August 12, 1992. See id., Exhibit B. Another letter from Vitrophage's counsel, dated February 12, 1993, referred to putting Infinitech and Dr. Stanley Chang, a Cornell University researcher with whom Infinitech had been working, "on notice with respect to their infringing activities." Id., Exhibit C. Vitrophage sent a letter to the dean of Cornell's medical school, stating that Dr. Chang "and others at Cornell University, as employees of the University, may be engaged in an infringement of the rights of Vitrophage ... embodied in the above U.S. patent by using or supplying perflourocarbons to others in violation of the above patent." Id., Exhibit D.

In response, Infinitech's counsel informed Vitrophage on March 2, 1993, that Infinitech had invested "hundreds of thousands of dollars" in the development of Perfluoron since the lapse of the '351 patent. Id., Exhibit E. Infinitech's counsel also outlined its equitable intervening rights argument and its argument that the '351 patent was wrongly reinstated and thus unenforceable. Id. Al-though Infinitech offered to enter into negotiations over a possible license, id., Vitrophage responded on March 22, 1993, that it was "not interested" in licensing discussions. Id., Exhibit F. Vitrophage further stated that Infinitech's letter "does not make out a case for Infinitech's equitable right to continue to infringe upon the ['351] patent rights. Rather than argue about it on the basis of limited facts, and your client's unwillingness for business reasons to get into details which would enable a more enlightened evaluation, it looks like this issue will be held over until sometime in the future." Id.

The future arrived on May 11, 1993, when Infinitech brought suit in this court for a declaratory judgment. Vitrophage's motion to dismiss under Rule 12(b)(1) requires the court to consider whether it may exercise subject-matter jurisdiction by authority of the Declaratory Judgment Act, 28 U.S.C. § 2201.

## ANALYSIS

### I. Requirements for Jurisdiction under the Act

The Declaratory Judgment Act provides that "[i]n a case of actual controversy," the district court, upon the filing of an appropriate pleading, "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. In patent litigation, the Act's sole requirement for jurisdiction "is that the conflict be real and immediate, i.e., that there be a true, actual 'controversy' required by the Act." Cardinal Chem. Co. v. Morton Intern., Inc., —— U.S. ——, ——, 113 S.Ct. 1967, 1975, 124 L.Ed.2d 1 (1993). Of course, the federal judicial power may never extend beyond "cases" or "controversies." U.S. Const., art. III, § 2, cl. 1. In patent litigation, the Supreme Court has recognized that an actual controversy may exist even before a patent holder sues for infringement. Cardinal, —— U.S. at ——, 113 S.Ct. at 1974. The Declaratory Judgment Act was intended to address, in the patent context, "the sad and saddening scenario" in which "a patent owner engages in a danse macabre, brandishing a Damoclean threat with a sheathed sword." Id.

Before the Act, competitors victimized by that tactic were rendered helpless and immobile so long as the patent owner refused to grasp the nettle and sue. After the Act, those competitors were no longer restricted to an *in terrorem* choice between the incurrence of a growing potential liability for patent infringement and abandonment of their enterprises; they could clear the air by suing for a judgment that would settle the conflict of interests.

*Id.* at —— – ——, 113 S.Ct. at 1974–75 (quoting *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 734–35 (Fed.Cir. 1988)). The converse of a true controversy would be a situation in which the declaratory judgment plaintiff seeks an advisory opinion in a dispute not yet ripe for litigation. *BP Chem., Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 977 (Fed.Cir.1993).

■ Accordingly, the court must determine whether an actual controversy exists. Commonly, federal courts have employed a two-part test in patent cases, requiring: (1) action by the patent holder creating in the declaratory plaintiff a reasonable apprehension of its facing an infringement suit; and (2) action by the declaratory plaintiff to produce or to make preparations for production of an allegedly infringing product. *Id.* at 978; *International Harvester Co. v. John Deere & Co.,* 623 F.2d 1207, 1210 (7th Cir. 1980). The Federal Circuit, the leading authority on patent law, also has referred to the foregoing test as "often useful," while noting that most "tests" employed in the art of judging "must be read, applied, and perhaps modified in light of the facts of subsequent cases." *Arrowhead,* 846 F.2d at 736. Indeed, the Supreme Court has stated in recent dicta that when the declaratory plaintiff merely desires to avoid the threat of a "scarecrow" patent, and the plaintiff "has actually been charged" with infringing the patent, "there is, *necessarily,* a case or controversy adequate to support jurisdiction of a complaint, or counterclaim, under the Act." *Cardinal,* —— U.S. at ——, 113 S.Ct. at 1975 (emphasis in original). The Supreme Court also has described the difference between an abstract question and a "controversy" cognizable under the Act as "necessarily one of degree," and one that may not easily lend

itself to a precise test. *Maryland Casualty Co. v. Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* In the trial court, the party seeking the declaratory judgment has the burden of establishing an actual controversy. *Cardinal,* —— U.S. at ——, 113 S.Ct. at 1974 (citing *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937)).

## II. Application of the Federal Circuit's Two–Pronged Test

The Federal Circuit's two-pronged test is useful in determining whether an actual controversy exists in this patent litigation. The court will apply that test but will remain mindful of the need to consider "all the circumstances." The court's consideration will require it to look at evidence presented outside the Complaint, as is appropriate when the defendant raises factual questions concerning jurisdiction under the Declaratory Judgment Act. *International Harvester,* 623 F.2d at 1210.

### A. Reasonable Apprehension of Suit

■ The first prong of the test looks to whether the conduct of the patent holder created an objectively reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit. *Union Carbide,* 4 F.3d at 978; *Spectronics Corp. v. H.B. Fuller Co., Inc.,* 940 F.2d 631, 634 (Fed. Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991); *Arrowhead,* 846 F.2d at 736. While courts have not required an express charge of infringement, the existence of an express charge is clearly sufficient. *Union Carbide,* 4 F.3d at 979; *Arrowhead,* 846 F.2d at 736.

■ In this case, Infinitech alleges that Vitrophage has threatened to bring a patent infringement suit over Infinitech's plans to develop and market Perfluoron. Complaint,

at 10. The several communications from Vitrophage's counsel, recited earlier in this opinion, clearly support Infinitech's contention that it reasonably feared an infringement suit. In the letters, Vitrophage repeatedly referred to Infinitech's activity as "infringement."

Vitrophage now argues that Infinitech could not reasonably have feared suit because counsel who had sent the threatening letters was "wrong," and because Infinitech knew its clinical testing of Perfluoron was statutorily exempt from infringement. Defendant Vitrophage's Reply Memorandum, at 3. Vitrophage also goes so far as to say that Infinitech's purported lack of a reasonable apprehension of suit is "confirmed" by its March 22 letter stating that "it looks like this issue will be held over until sometime in the future," perhaps hoping the court would ignore the same letter's argument that Infinitech has no right "to continue to infringe." To the contrary, the contents of Vitrophage's letters, taken as a whole, demonstrate that Vitrophage did threaten Infinitech through precisely the sort of *"danse macabre"* that courts have recognized as an actual controversy under the Declaratory Judgment Act.[1] Moreover, if the court were to follow Vitrophage's logic, any patent holder could threaten suit and then defeat declaratory judgment jurisdiction by retracting its prior threats as having been "wrong."

### B. The Infringement Prong

The more difficult question in this case is whether Infinitech could be said to have undertaken meaningful preparations for production of an infringing product, such that Infinitech could begin production immediately if it could avoid liability for patent infringement. *See International Harvester,* 623 F.2d at 1210. This is the actual controversy test's second prong, which the Federal Circuit recently stated more loosely as "present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *Union Carbide,* 4 F.3d at 978. The infringement prong necessarily looks to the declaratory plaintiff's conduct, which must establish that the plaintiff has "a true interest to be protected," rather than a desire for an advisory opinion on whether it would be liable if it initiated "some merely contemplated activity." *Arrowhead,* 846 F.2d at 736. The plaintiff can make such a showing by demonstrating "meaningful preparation" for the activity subject to an infringement charge. *Id.*

Infinitech asserts that it has spent or committed to spend more than $1 million to develop Perfluoron, with significant monetary investments still to come during the ongoing regulatory approval process. Plaintiff's Memorandum in Opposition at 3. Infinitech states it spent the money on commitments to perfluorocarbon suppliers, license fees to Cornell University, clinical testing of Perfluoron to support Infinitech's application for FDA approval, and the purchase of a business producing various devices for use in retinal surgery. *Id.* at 3–4. The parties do not dispute that Infinitech's clinical testing of Perfluoron, in preparation for obtaining FDA approval, is rendered exempt from infringement by 35 U.S.C. § 271(e)(1).[2]

Vitrophage argues that Infinitech has not prepared an infringing product because of the statutory exemption. In addition, because Infinitech has yet to obtain FDA approval, and because Infinitech cannot market

---

1. Vitrophage's argument that Infinitech can no longer reasonably fear suit at present, because of Vitrophage's recent concession that its counsel was "wrong," similarly rings hollow. Vitrophage correctly cites the Federal Circuit's decision in *Spectronics* for the rule that the actual controversy must exist not only at the time the declaratory judgment action is filed, but throughout the pendency of the action. *See Spectronics,* 940 F.2d at 635. However, in *Spectronics,* the patent holder issued a "statement of nonliability" that "forever estopped" it from asserting the patent infringement claims against the declaratory plaintiff. *Id.* at 636. By contrast, Vitro-

phage's recent—and, in the court's view, tactical—agreement with Infinitech's safe harbor argument does not sufficiently quell Infinitech's reasonable apprehension of suit.

2. The exemption provides that "[i]t shall not be an act of infringement to make, use, or sell a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products." 35 U.S.C. § 271(e)(1).

Perfluoron without such approval, Vitrophage argues that Infinitech is not prepared to produce an infringing product. Vitrophage thus asks the court to engage in a literal reading of cases such as *International Harvester* to hold that no actual controversy can exist if the declaratory plaintiff does not have the present ability to market a potentially infringing product. The court declines the invitation, for several reasons.

Vitrophage cites the cases of *Intermedics v. Ventritex, Inc.*, 775 F.Supp. 1269 (N.D.Cal. 1991), *aff'd*, 991 F.2d 808 (Fed.Cir.1993), and *Telectronics Pacing Sys., Inc. v. Ventritex, Inc.*, 982 F.2d 1520 (Fed.Cir.1992), for the proposition that the applicability of § 271(e)(1)'s safe harbor precludes jurisdiction under the Declaratory Judgment Act. Those cases did so hold, but both were brought by patent holders who sought declarations that the defendants' products infringed the plaintiffs' patents.[3] Vitrophage points the court to the Supreme Court's statement that "[i]t is immaterial that frequently, in the declaratory judgment suit, the positions of the parties in the conventional suit are reversed; the inquiry is the same in either case." *See Maryland Casualty*, 312 U.S. at 273, 61 S.Ct. at 512.

But the quoted language does not compel courts to ignore the particular circumstances and relations between the parties in each case; the Supreme Court instead framed the inquiry as encompassing "all the circumstances." *Id.* When the declaratory plaintiff is a patent holder seeking a ruling of infringement against a product still in clinical testing, the purposes of the Act and of § 271(e)(1) are not undermined by holding that jurisdiction does not attach until after the allegedly infringing product moves beyond clinical testing. The patent holder loses nothing by waiting, as the alleged infringer cannot market the product until gaining government approval, which could only strengthen the patent holder's infringement case. On the other hand, as Judge Markey observed in *Arrowhead*, the alleged infringer has everything to lose by being forced to shelve its declaratory judgment suit until after its product receives federal approval. *See Arrowhead*, 846 F.2d at 734–35. The court declines to construe the Declaratory Judgment Act as placing all of the burden and risk on those who would seek to develop new medical and surgical products that require extensive development, investment, and clinical testing on the road to the government approval necessary for actual marketing and sale. Whether the declaratory plaintiff has "a true interest to be protected," *id.* at 736, should not depend on final government approval in these circumstances.

The court also is persuaded that Infinitech's actions in developing Perfluoron and in taking steps to obtain FDA approval sufficiently demonstrate Infinitech's intent to try to bring Perfluoron to market in some form.[4] While Infinitech may not have the present ability to market Perfluoron, it has embarked upon a protracted and costly process of obtaining regulatory approval. Infinitech's conduct thus evinces the kind of "concrete steps" or "meaningful preparation" needed to

3. The parties's briefs on this motion have devoted extensive discussion to the cases of *Farmaceutisk Laboratorium Ferring A/S v. Solvay Pharmaceuticals, Inc.*, 25 U.S.P.Q.2d 1344 (N.D.Ga. 1992), and *Zenith Laboratories, Inc. v. Bristol–Myers Squibb Co.*, 24 U.S.P.Q.2d 1641, 1991 WL 267892 (D.N.J.1991). Infinitech has represented to the court that these are the only reported cases in which parties protected under 35 U.S.C. § 271(e)(1) have sought declaratory relief from potential infringement claims while the parties were still before the FDA. Plaintiff's Surreply, at 5. But the court in *Zenith* designated that case as "not for publication," *Zenith*, 24 U.S.P.Q.2d at 1641, and the *Solvay* court's findings largely turned upon the distinction between an argument concerning infringement and one concerning patent validity. *Solvay*, 25 U.S.P.Q.2d at

1351. Although Infinitech seeks a declaration of invalidity, as opposed to noninfringement, this court considers that issue tangential and believes that the Supreme Court and Federal Circuit cases provide sufficient guidance to decide the issues raised by Vitrophage's motion, *Zenith* and *Solvay* notwithstanding.

4. The court is not concerned with Vitrophage's argument that jurisdiction is defeated by the fact that the ultimate product approved by the FDA, if any, might differ from the product which the court might find protected by intervening equitable rights. Infinitech points out that any such product would be perfluorocarbon-based and as such would raise issues as to infringement of the '351 patent, if that patent is valid and enforceable.

establish an actual controversy under "all the circumstances." *See generally Maryland Casualty*, 312 U.S. at 273, 61 S.Ct. at 512; *Union Carbide*, 4 F.3d at 978; *Arrowhead*, 846 F.2d at 736.

## CONCLUSION

For the reasons stated, the court finds that this case presents an actual controversy subject to federal jurisdiction under 28 U.S.C. § 2201. Accordingly, the court denies Vitrophage's motion to dismiss Infinitech's First Amended Complaint.