**BIOGEN, INC., Plaintiff,**

v.

**SCHERING AG, Berlex Laboratories, Inc. and Board of Trustees of the Leland Stanford, Jr. University, Defendants.**

**C.A. No. 96–10916–MLW.**

United States District Court, D. Massachusetts.

Nov. 5, 1996.

As amended Dec. 4, 1996.

William F. Lee, David B. Bassett, Hale & Dorr, Boston, MA, Albert E. Fey, James F. Haley, Gerald J. Flattmann, Douglas J. Gilbert, Fish & Neave, New York City, for Biogen, Inc.

Arnold P. Messing, Eric J. Marandett, Choate, Hall & Stewart, Boston, MA, Doborah D. Borsinger, Berlex Laboratories, Assistant General Counsel, Wayne, NJ, for Berlex Laboratories.

James S. DeGraw, Ropes & Gray, Boston, MA, for Board of Trustees of the Leland Stanford, Jr. University.

## MEMORANDUM AND ORDER

WOLF, District Judge.

### I. INTRODUCTION

On May 3, 1996, Plaintiff Biogen, Inc. ("Biogen") filed this action seeking a declaration that its Avonex product does not infringe defendants' McCormick '567 patent (the " '567 Patent") and that the '567 Patent is invalid. Biogen did not, however, attempt to serve its complaint immediately on the defendants. On July 3, 1996, defendant Berlex Laboratories, Inc. ("Berlex") filed its own suit in the District of New Jersey, seeking monetary and injunctive relief against Biogen for alleged infringement of the '567 Patent. As a result, Biogen served its complaint two days later.

Berlex has moved for dismissal of Biogen's declaratory judgment action for lack of subject matter jurisdiction, claiming that no case or controversy existed at the time Biogen filed its suit. Alternatively, Berlex urges the court to exercise its discretion to dismiss the declaratory judgment action on the basis of Biogen's alleged improper forum shopping. Berlex's parent company and co-defendant Schering Aktiengesellschaft ("Schering AG") has filed a separate motion alleging that it is not a proper party to this action because it

holds no legally cognizable interest in the '567 Patent. As indicated at the hearing on October 9, 1996, since the parties have not fully briefed the issue of whether Schering AG is a proper party, the court will not address that issue at this time.

As explained below, the court finds that a case and controversy existed on May 3, 1996 because Biogen had a reasonable apprehension that it would face an infringement suit by Berlex, and Biogen had made a substantial investment in developing Avonex and producing it for sale promptly after the anticipated approval of the United States Food and Drug Administration (the "FDA"), which occurred on May 17, 1996. In addition, the court finds that neither equitable factors nor the convenience of the defendant suffice to overcome the presumption that this litigation should be conducted in the forum of first filing. Accordingly, Berlex's motion to dismiss is being denied.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are either undisputed or established by a preponderance of the evidence. Berlex is a pharmaceutical corporation with headquarters in Wayne, New Jersey. It is a wholly-owned subsidiary of Schering AG, a German pharmaceutical company. Biogen is a corporation based in Cambridge, Massachusetts that specializes in biotechnology.

For a number of years both Schering AG/Berlex and Biogen have been doing research and developing products relating to the production of human beta interferon using recombinant DNA technology. Among these products are drugs intended for the treatment of multiple sclerosis. These include Biogen's Avonex, a beta interferon-based drug extracted from Chinese hamster ovary ("CHO") cells, and Berlex/Schering AG's Betaseron, another beta interferon drug produced using a different process not covered by the '567 Patent. Avonex and the '567 Patent are at issue in this case.

In the fall of 1993, Dr. Ulrich Kostlin of Schering AG approached Biogen about licensing Biogen's portfolio of patents related to beta interferon. Also discussed at that

time was a mutual "unblocking" agreement which would permit each party to market its respective beta interferon products without fear of infringement suit by the other. These negotiations terminated in late 1993 without agreement.

On December 27, 1994, the '567 Patent issued to Berlex and the Board of Trustees of Leland Stanford, Jr. University ("Stanford"). By prior agreement, Berlex's rights in the patent vested at that time in Schering AG.

On January 12, 1995, the *New York Times* published an article headlined "Biogen's Share Price Drops in a Running Patent Battle." Plaintiff's Appendix of Deposition Transcripts and Exhibits ("Plaintiff's App."), Ex. 14. The article began by stating:

> Firing a volley in a war over biotechnology patents, Schering AG, the German drug maker, said yesterday that it had been awarded exclusive rights in a process being used by Biogen, Inc. The announcement sent shares of Biogen tumbling.

*Id.* The article then quoted a Schering AG spokesman as stating that "the ['567 Patent] could block Biogen ... from making its version of beta interferon for the treatment of multiple sclerosis." *Id.*

Similarly, on January 26, 1995, the *Wall Street Journal* reported on what it characterized as the "patent dispute [between Schering AG and Biogen] over novel drugs for multiple sclerosis with a potential value of $1 billion in annual revenue." Plaintiff's App., Ex. 23. The article stated that:

> The dispute heated up with Schering's surprise announcement that it holds rights to the U.S. and European patents covering technology Biogen uses to make beta interferon, its MS drug under development.

*Id.* In the article, Biogen denied it infringed the '567 Patent, and raised questions concerning its validity. *Id.* A Schering AG spokesman was quoted as saying that the company did not "plan to 'use [its] patents to block' Biogen from marketing beta interferon but foresees patent 'negotiations' between the companies." *Id.*

On May 22, 1995 Biogen announced that it had submitted a Product License Application for its Avonex product to the FDA. Berlex promptly raised numerous objections to the approval of Avonex in letter briefs submitted to the FDA.

Also, in the Spring of 1995, Biogen filed applications with foreign regulatory authorities for approval to market Avonex abroad. In connection with its foreign approval applications, Biogen sent samples of Avonex made in the United States to the pertinent foreign regulatory authorities.

In July 1995, Kostlin and Kenneth Bate of Biogen met to discuss issues related to Avonex and the '567 Patent. As foreshadowed by the January 1995 *Wall Street Journal* article, Kostlin suggested cross-licensing of the parties' respective beta interferon products and shared access to clinical data. In support of this suggestion Kostlin stated that export of Avonex produced in the United States would infringe Schering AG's '567 Patent and, therefore, could if necessary be prevented. At the July 1995 meeting, Bates told Kostlin that Schering AG's cross-licensing proposal was "unacceptable."

In the fall of 1995, and again in March 1996, Kostlin contacted Bate in an effort to resume the discussions which failed in July 1995. Biogen, however, was not receptive to these requests.

In the second half of 1995, Berlex and Schering AG began preparing a possible transfer of Schering AG's interest in the '567 Patent to Berlex in anticipation of possible litigation with Biogen. Such a transfer had the potential to simplify any litigation related to the '567 Patent by enabling Berlex to sue in its own name and reducing the risk that Schering AG would be deemed a necessary party.

In late 1995, Berlex began appearing before the FDA to oppose the approval of Avonex, and threatened to file suit to enjoin the FDA from approving Avonex if necessary. As a result, on April 25, 1996, the FDA instructed Biogen to speak with Berlex to attempt to avert litigation and settle the dispute concerning FDA approval of Avonex. On April 26, 1996, however, Berlex sued the FDA in the United States District Court for the District of Columbia seeking to enjoin approval of Avonex, as well as a declaratory judgment that such approval would be contrary to the Public Health Service Act, the Orphan Drug Act and the FDA's regulations. Biogen intervened in the action. On April 30, 1996, the court denied Berlex's request for a temporary restraining order.

Biogen filed the present action for declaratory judgment on May 3, 1996. However, no attempt to serve any of the defendants was made at that time. Biogen filed its suit because it expected that Berlex would sue it and Biogen wanted to conduct any litigation concerning Avonex and the '567 Patent in Massachusetts. Biogen did not immediately attempt to serve its complaint, however, because if its assumption that Berlex would sue proved to be incorrect, Biogen preferred not to litigate at all.

As directed by the FDA, Biogen also arranged to meet with defendants on May 16, 1996 to attempt to resolve the then-pending suit. Biogen did not, however, tell defendants that it was accepting their invitation to meet again because of an FDA directive. At the May 16, 1996 meeting Kostlin essentially outlined again the proposal Schering AG had made at the July 1995 meeting. Biogen again rejected that proposal.

On the following day, May 17, 1996, the FDA approved Avonex as a treatment for multiple sclerosis. At that point Biogen had already spent in excess of $150 million developing Avonex and over $24 million stockpiling and preparing to sell the drug in anticipation of FDA approval. Biogen began selling Avonex promptly following the FDA's approval.

On May 21, 1996, Schering AG transferred the '567 Patent to Berlex in anticipation of a suit by Berlex against Biogen. On July 3, 1996, Berlex filed a patent infringement suit against Biogen in the District of New Jersey. On the same day, Biogen disclosed the existence of its own suit in a press release. Biogen served Berlex on July 5, 1996.

On October 7, 1996, Berlex's suit against the FDA was dismissed. On October 9, 1996, the motion to dismiss this case was

argued, after expedited discovery and briefing by the parties.

## III. DISCUSSION

### A. *Standard for 12(b)(1) Motion to Dismiss*

"If a Rule 12(b)(1) motion denies or controverts the pleader's allegations of jurisdiction ... the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction." *Cedars–Sinai Medical Center v. Watkins,* 11 F.3d 1573, 1583 (Fed. Cir.1993), *cert. denied,* 512 U.S. 1235, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994). For purposes of such a motion, "the allegations in the complaint are not controlling ... and only uncontroverted factual allegations are accepted as true." *Id.* "All other facts underlying the controverted jurisdictional allegations are in dispute and are subject to fact-finding by the district court." *Id.* at 1584. "[T]he court has great latitude to direct limited discovery and to make such factual findings as are necessary to determine its subject matter jurisdiction." *Rivera–Flores v. Puerto Rico Telephone Co.,* 64 F.3d 742, 748 (1st Cir.1995).

Accordingly, in considering defendants' motion to dismiss for lack of subject matter jurisdiction, the court has looked beyond the pleadings to the affidavits and depositions submitted by the parties to determine whether the facts establish its jurisdiction over this action and, if so, whether it should exercise its discretion to permit this case to proceed in the District of Massachusetts or dismiss it in favor of Berlex's action in New Jersey. *Id. See also Ernst & Young v. Depositors Economic Protection Corporation,* 862 F.Supp. 709, 713 (D.R.I.1994), *aff'd* 45 F.3d 530 (1st Cir.1995).

### B. *This Court Has Subject Matter Jurisdiction*

This court has subject matter jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201, and Article III, § 2 of the United States Constitution only if a case or controversy existed between the parties at the time the complaint was filed. A party may not "obtain a declaratory judgment merely because it would like an advisory opinion on whether it would be liable for patent infringement if it were to initiate some merely contemplated activity." *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736 (Fed.Cir.1988). Rather, "the conflict must be real and immediate." *Id.* at 735.

■ A two-part test has been developed to distinguish cases impermissibly seeking advisory opinions from those presenting justiciable cases and controversies. A party seeking a declaration of patent invalidity or noninfringement must prove that: (1) the defendant has engaged in conduct creating a reasonable apprehension on the declaratory plaintiff's part that it will face an infringement suit if it engages in the activity in question; and (2) the declaratory plaintiff has actually produced or has actually prepared to produce the potentially infringing device. *GAF Building Materials Corp. v. Elk Corp.,* 90 F.3d 479, 481 (Fed.Cir.1996). The "purpose of the two-part test is to determine whether the need for judicial attention is real and immediate or is prospective and uncertain of occurrence." *BP Chemicals Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 978 (Fed.Cir.1993) (citations omitted).

With regard to the first prong of the test, no express charge of infringement or threat of suit is required. Rather, a reasonable apprehension of suit "may be induced by subtler conduct if that conduct rises 'to a level sufficient to indicate an intent [on the part of the patentee] to enforce its patent,' i.e. to initiate an infringement action." *EMC Corp. v. Norand Corp.,* 89 F.3d 807, 811 (Fed.Cir.1996) (quoting *Shell Oil Company v. Amoco Corporation,* 970 F.2d 885, 887 (Fed. Cir.1992)). In making this determination, the court must consider the "totality of the circumstances." *Arrowhead,* 846 F.2d at 736. *See also Maryland Casualty Company v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941); *EMC,* 89 F.3d at 812 (Fed.Cir.1996) ("inquiry does not turn on whether the parties have used particular 'magic words' "). The test is objective and must be applied to the facts as they existed and were known to the plaintiff when the complaint was filed. *Arrowhead,* 846 F.2d at 736.

Similarly, with regard to the second prong, a declaratory plaintiff need not have actually produced or be selling the product at issue as long as it has engaged in "present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *BP Chemicals Ltd.,* 4 F.3d at 978.

■ With regard to the first prong of the test, as of May 3, 1996 defendants' conduct and the entire course of dealing between the parties created an objectively reasonable apprehension on the part of Biogen that the defendants intended to enforce their '567 Patent by means of an infringement suit. As described earlier, on at least two occasions Schering AG representatives reportedly claimed that the '567 Patent could block the production or export of Avonex, thus in effect charging infringement. The media viewed these statements not only as evidence of a "patent dispute," Plaintiff's App. Ex. 24, but as part of a "battle" or "war" for a very lucrative market. *Id.,* Ex. 14. At the July 1995 meeting, Schering AG's representative stated a preference for a licensing arrangement, but also expressed a willingness to take action to enforce the '567 Patent if negotiations failed. Plaintiff's App., Ex. 22. Those negotiations did fail. After that meeting, despite some attempts by defendants to resume the dialogue, their conduct became increasingly hostile. Berlex attempted to block FDA approval of Avonex, filing suit to do so in April 1996. This course of conduct was sufficient to "indicate an intent on the part of [the defendants] to enforce [their] patent" by filing a suit alleging patent infringement if its other efforts to keep Avonex from the market failed. *EMC,* 89 F.3d at 811. Thus, based on the totality of the circumstances known to Biogen on May 3, 1996, it had a reasonable apprehension that defendants would sue to enforce their patent in an effort to prevent the marketing of Avonex.

Contrary to defendants' contention, this conclusion is not qualified because Biogen was on May 3, 1996 immune from suit by virtue of the "safe harbor" provision of 35 U.S.C. § 271(e)(1) and, therefore, knew it could not then be sued by defendants. As described below, Biogen knew that its sub-

stantial and expensive effort to produce Avonex for sale in anticipation of FDA approval, as well as its submission of the product for foreign approval, took it out of the safe harbor as of May 3, 1996.

The reasonableness of Biogen's apprehension of suit on May 3, 1996 is reinforced by what has occurred and what has been disclosed since that date. Discovery in this case has indicated that in late 1995 defendants began planning to transfer the '567 Patent from Schering AG to Berlex in anticipation of litigation with Biogen. Moreover, Berlex filed suit in July 1996, suggesting the reasonableness of Biogen's belief on May 3, 1996 that defendants would do so if, as anticipated, Biogen again refused the cross-licensing arrangement it had rejected in July 1995.

Biogen has also satisfied the second prong of the case or controversy test because as of May 3, 1996 it had actually produced Avonex for sale in anticipation of receiving the FDA's approval and taken other concrete steps to market the drug promptly. The company had invested more than $150 million in research and development concerning Avonex, and had spent another $24 million to stockpile and prepare to market the drug.

Accordingly, Biogen had by May 3, 1996 clearly manifested by its actions its intent to market Avonex as soon as possible. Thus, it was not then seeking an advisory opinion on whether it would infringe the '567 Patent if it initiated "some merely contemplated activity." *Arrowhead,* 846 F.2d at 736. Rather, its need for a decision was "real and immediate." *Id.*

■ Contrary to the defendants' claim, on May 3, 1996 Biogen was not within the "safe harbor" which would immunize it from suit by defendants pursuant to 35 U.S.C. § 271(e)(1) and, therefore, arguably make it inappropriate to permit Biogen to initiate suit. This provision exempts from infringement only actions taken "*solely* for uses reasonably related to the development and submission of information under a federal law which regulates the manufacture, use, or sale of drugs ..." 35 U.S.C. § 271(e)(1) (emphasis added). Biogen had done far more than merely do clinical trials for submission to the

FDA, it had spent $24 million to stockpile and prepare to market Avonex immediately upon the anticipated, imminent FDA approval in order to access promptly the lucrative market for beta interferon drugs to combat multiple sclerosis. These actions took Biogen out of the "safe harbor," made it subject to suit as of May 3, 1996, and gave it standing to sue itself. *Infinitech v. Vitrophage, Inc.,* 842 F.Supp. 332, 337–38 (N.D.Ill.1994); *Farmaceutisk Laboratorium Ferring A/S v. Solvay Pharmaceuticals, Inc.,* 25 U.S.P.Q. 1344, 1349–51, 1992 WL 421542 (N.D.Georgia, 1992).[1]

The fact that the FDA had not yet approved Avonex does not qualify this conclusion. As the court in *Infinitech* said in rejecting a similar claim that the lack of FDA approval was fatal to a finding of a case and controversy:

> While [plaintiff] may not have [had] the present ability to market [its product], it ha[d] embarked upon a protracted and costly process of obtaining regulatory approval. [Plaintiff's] conduct thus evinces the kind of 'concrete steps' or 'meaningful preparation' needed to establish an actual controversy under 'all the circumstances.'

1. Biogen's shipment of Avonex samples produced in the United States to foreign regulatory authorities was not related to FDA requirements or other federal law and, therefore, was outside the statutory exemption. *NeoRX v. Immunomedics, Inc.,* 877 F.Supp. 202, 207 (D.N.J.1994). *See also Scripps Clinic & Research Found. v. Genentech, Inc.,* 666 F.Supp. 1379, 1396 (N.D.Cal. 1987) (uses of product "serving multiple purposes unrelated to meeting FDA requirements," including the "preparation of Genentech's application for a European patent," are beyond the protection of § 271(e)(1)).

Berlex and Schering AG cite *Intermedics, Inc. v. Ventritex, Inc.,* 775 F.Supp. 1269, 1281 (N.D.Cal.1991), *aff'd,* 991 F.2d 808 (Fed.Cir. Feb. 22, 1993) (unpublished disposition) for the proposition that "the submission of *clinical testing data* in support of a foreign regulatory filing does not fall outside § 271(e)(1)." Memorandum in Response to Biogen's Memorandum to Clarify Record on "Safe Harbor" Provision at 2. It is important to recognize, however, that the *Intermedics* court merely found that sending clinical testing data, rather than *samples,* was not an act of infringement; therefore, it was not necessary for the court to rely upon any safe harbor analysis. The instant case is distinguishable from *Intermedics* because Biogen sent samples of

842 F.Supp. at 337–38 (quoting *BP Chemicals,* 4 F.3d at 978). *See also Solvay,* 25 U.S.P.Q.2d at 1349–51.[2]

## C. Dismissal of the Case is not Appropriate as an Exercise of Discretion

The finding that subject matter jurisdiction exists does not end the inquiry concerning the defendants' motion to dismiss. As the Supreme Court recently affirmed, the Declaratory Judgment Act accords district courts "a unique breadth of ... discretion to decline to enter a declaratory judgment." *Wilton v. Seven Falls Co.,* —— U.S. ——, ——, 115 S.Ct. 2137, 2143, 132 L.Ed.2d 214 (1995). Such discretion is not unfettered, however, and must be exercised in accordance with the principles of the Declaratory Judgment Act and sound judicial administration. *EMC,* 89 F.3d at 813–14.

The defendants urge the court to exercise its discretion to decline to hear this action. To do otherwise, they argue, would reward inequitable behavior by Biogen in filing its suit in the midst of ongoing negotiations and then concealing the existence of that suit "solely for the tactical purpose of forum shopping." Berlex Mem., p. 18. This argument, however, is not persuasive. When

Avonex abroad. *See NeoRX,* 877 F.Supp. at 207; *Scripps Clinic,* 666 F.Supp. at 1396.

2. Like *Infinitech* and *Solvay,* the instant case is distinguishable from those in which courts have found the safe harbor provision to bar a declaratory judgment suit because of the alleged infringer's *de minimis* activities. *See Intermedics,* 775 F.Supp. at 1289–90 (if in the future defendant "engages in non-*de minimis* activities that are not reasonably related to securing FDA approval ... plaintiff can revive its patent infringement claims"); *Upjohn Co. v. Monsanto Co.,* 1992 WL 792837, at *4, 1992 U.S. Dist. LEXIS 14917, at *11–13 (W.D.Mich. June 30, 1992) (plaintiff's claims for non-infringement and invalidity were not ripe for judicial review because plaintiff had not yet sought FDA approval and "preliminary steps to FDA approval ... [did] not rise to the level of possibly infringing activity"); *Zenith Laboratories, Inc. v. Bristol–Myers Squibb Co.,* 24 U.S.P.Q.2d 1641, 1646, 1991 WL 267892 (D.N.J. 1991) (controversy not ripe where both the intent and the ability of the declaratory judgment plaintiff to market the potentially infringing product depended upon "a number of contingent factors," including FDA approval, commercial prospects, and plaintiff's ability to secure an FDA-approved supplier).

Biogen filed its suit on May 3, it had a reasonable apprehension of an infringement action by Berlex, but such suit was not then certain. Biogen's decision to file but not to serve its suit immediately manifested a desire on its part both to avoid litigation if at all possible and to attempt to secure the convenience of a Massachusetts forum if litigation was required. In these circumstances, it would not be inequitable to have this dispute litigated in Massachusetts.

More specifically, "[t]he general rule favors the forum of the first-filed action, whether or not it is a declaratory action. Exceptions, however, are not rare, and are made when justice or expediency requires, as in any issue of choice of forum.... There must, however, be sound reasons that would make it unjust or inefficient to continue the first-filed action." *Genentech, Inc. v. Eli Lilly,* 998 F.2d 931, 937–38 (Fed.Cir.1993) (citations omitted). *See also Kahn v. General Motors,* 889 F.2d 1078, 1081 (Fed.Cir.1989). In this case, the facts and equitable factors are insufficient to overcome the presumption in favor of the forum in the first-filed case.

Defendants do not contend that the convenience of the parties or the witnesses justifies dismissing this case in favor of Berlex's action in New Jersey. As they recognize, all parties are substantial entities, fully capable of litigating in Massachusetts or New Jersey, although Massachusetts is more convenient for Biogen and New Jersey is more convenient for Berlex.

Defendants ardently argue, however, that this case is analogous to *Davox Corporation v. Digital Systems International, Inc.,* in which this court exercised its discretion to dismiss a case seeking a declaratory judgment concerning possible patent infringement "because it would be inappropriate to reward—and indeed abet—conduct which is inconsistent with the sound policy of promoting extrajudicial dispute resolution, and conservation of judicial resources." 846 F.Supp. 144, 148 (D.Mass.1993). However, retaining jurisdiction of this case in Massachusetts is actually consistent with the rationale of *Davox* rather than contrary to it.

In *Davox,* the defendant notified the declaratory plaintiff, Davox, by letter that it viewed the plaintiff's product as infringing, and invited the plaintiff to respond to its concerns. 846 F.Supp. at 146–47. While Davox represented that it was willing to enter into discussions to resolve the matter, it in fact filed a preemptive action for declaratory judgment. *Id.* at 148. Despite the fact that the defendant's letters were "ominous enough to generate a reasonable apprehension of lawsuit," this court declined to exercise jurisdiction, finding that to do so would allow the plaintiff "to take advantage of the fact that [the defendant] responsibly deferred filing ... expensive litigation and, indeed, was perhaps misled into believing it would not be prejudiced by doing so by [plaintiff's] responses to its letters." *Id.* As plaintiff's conduct was "inconsistent with the strong public policy discouraging unnecessary litigation," this court stated that it did not want to reward Davox's inequitable conduct or encourage potential victims of infringement like Digital to sue prematurely and perhaps unnecessarily. *Id.* at 149. Thus, Davox's case was dismissed.

As discussed earlier, in the instant case, Biogen had a proper basis for bringing its suit on May 3, 1996. Its decision to defer serving it, despite its reasonable apprehension that defendants would bring their own suit and probable understanding that Biogen's claim to the priority of the first-filed forum would be eroded by the fact that its action was not the first served, actually minimized the risk of unnecessary litigation; if Biogen's prediction was not prophetic and it was never sued, it could have declined to serve its complaint, and litigation would have been averted.

Similarly, the instant case is distinguishable from the decision in *EMC* to dismiss the first-filed case because of inequitable conduct. 89 F.3d at 815. In *EMC,* the plaintiff was found to have "abuse[d] the declaratory judgment device to obtain a more favorable bargaining position in its ongoing negotiations with the patentee and also to undermine the value of the patent so as to impede its sale or licensing to a third party." *Id.* at 814. Thus, it was appropriate to dismiss the case in favor of a forum more convenient to the patentee, which had been lulled into de-

ferring its possible suit based on EMC's representations regarding its interest in negotiating rather than litigating. *Id.* at 807.

While defendants' irritation at not being informed at the May 16, 1996 meeting that this suit had been filed is understandable, this is not a factor that is sufficiently serious to justify penalizing Biogen for its restraint in pursuing litigation by deferring service of its complaint. In the instant case, Biogen did not agree to the May 16, 1996 meeting with defendants for the purpose of lulling defendants into delaying suit so Biogen could sue first. Biogen acceded to the April 25, 1996 request by the FDA that it talk to Berlex. The scheduling of the meeting Berlex had been unsuccessfully seeking may have had the effect of influencing Berlex to slow down its preparations to sue. However, it is clear that either party could have properly filed suit immediately after May 17, 1996, when the parties' meeting had again failed to generate an agreement and the FDA had approved Avonex for sale. Defendant did not do so for another six weeks.[3]

3. Even assuming, without finding, that Biogen's willingness to meet on May 16, 1996 lulled defendants into deferring suit, it did so at most for about three weeks. Although defendants had since 1995 been taking steps in contemplation of possible litigation, including preparing to trans-

Had Biogen filed or served the instant case on May 18, 1996, the motion to dismiss would obviously be without merit. In view of the court's finding that a justiciable case and controversy existed on May 3, 1996, Biogen's delay in serving its complaint in order to assure that it would not be unnecessarily launching litigation does not alter the conclusion that it would be inappropriate for this court to exercise its discretion to dismiss this case.

## IV. ORDER

For the foregoing reasons, it is hereby ORDERED that:

1. Defendants' motion to dismiss (Docket No. 10) is DENIED.

2. The parties shall respond to the attached Scheduling Conference Order and include a proposed schedule for completing the briefing of Schering AG's motion to dismiss.

3. A scheduling conference will be held on December 4, 1996 at 2:30 p.m.

fer the '567 Patent to Berlex, they did not sue Biogen until six weeks after the renewed discussions failed and the FDA approved Avonex. Thus, the three weeks that defendants were arguably lulled into not filing suit is not material.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

## V. Civil Action

### NOTICE OF SCHEDULING CONFERENCE

An initial scheduling conference will be held in Courtroom No. 5, on the 12th flr. at    p m  on
in accordance with Fed. R. Civ. P. 16(b) and Local Rule 16.1. The court considers attendance of the senior lawyers ultimately responsible for the case and compliance with sections (B), (C), and (D) of Local Rule 16.1[1] to be of the utmost importance. Counsel may be given a continuance only if actually engaged on trial. Failure to comply fully with this notice and with sections (B), (C), and (D) of Local Rule 16.1 may result in sanctions under Local Rule 1.3. Counsel for the plaintiff is responsible for ensuring that all parties and/or their attorneys, who have not filed an answer or appearance with the court, are notified of the scheduling conference date.

                                              MARK.L. WOLF
Date:                                    United States District Judge

                                         By:_____
                                         Deputy Clerk

---

[1] These sections of Local Rule 16.1 provide:

(B) Obligation of counsel to confer. Unless otherwise ordered by the judge, counsel for the parties shall, pursuant to Fed.R.Civ.P. 26(f), confer no later than fourteen (14) days before the date for the scheduling conference for the purpose of:

(1) preparing an agenda of matters to be discussed at the scheduling conference,

(2) preparing a proposed pretrial schedule for the case that includes a plan for discovery, and

(3) considering whether they will consent to trial by magistrate judge

(C) Settlement proposals. Unless otherwise ordered by the judge, the plaintiff shall present written settlement proposals to all defendants no later than ten (10) days before the date for the scheduling conference. Defense counsel shall have conferred with their clients on the subject of settlement before the scheduling conference and be prepared to respond to the proposals at the scheduling conference.

(D) Joint statement. Unless otherwise ordered by the judge, the parties are required to file, no later than five (5) business days before the scheduling conference and after consideration of the topics contemplated by Fed R.Civ.P. 16(b) and 26(f), a joint statement containing a proposed pretrial schedule, which shall include

(1) a joint discovery plan scheduling the time and length for all discovery events, that shall

(a) conform to the obligation to limit discovery set forth in Fed. R. Civ. P. 26(b), and

(b) take into account the desirability of conducting phased discovery in which the first phase is limited to developing information needed for a realistic assessment of the case and, if the case does not terminate, the second phase is directed at information needed to prepare for trial; and

(2) a proposed schedule for the filing of motions, and

(3) certifications signed by counsel and by an authorized representative of each party affirming that each party and that party's counsel have conferred

(a) with a view to establishing a budget for the costs of conducting the full course—and various alternative courses—of the litigation  and

(b) to consider the resolution of the litigation through the use of alternative dispute resolution programs such as those outlined in Local Rule 16 4

To the extent that all parties are able to reach agreement on a proposed pretrial schedule, they shall so indicate. To the extent that the parties differ on what the pretrial schedule should be, they shall set forth separately the items on which they differ and indicate the nature of that difference. The purpose of the parties' proposed pretrial schedule or schedules shall be to advise the judge of the parties' best estimates of the amounts of time they will need to accomplish specified pretrial steps. The parties' proposed agenda for the scheduling conference, and their proposed pretrial schedule or schedules shall be considered by the judge as advisory only.

(Schedcnf nt: - 03 95)                                    (ntchrg. schedcnfddl.)