**KOS PHARMACEUTICALS,
INC., Plaintiff,**

v.

**BARR LABORATORIES,
INC., Defendant.**

**No.  02 CV 1683.**

United States District Court,
S.D. New York.

Jan. 21, 2003.

Denise L. Loring, Kenneth B. Herman, Robert B. Wilson, Fish & Neave, New York City, for Plaintiff.

Anne L. Quintal, Winston & Strawn, New York City, Brian L. Franklin, Chicago, IL, for Defendant.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Kos Pharmaceuticals, Inc. ("Kos") filed two actions against defendant Barr Laboratories, Inc. ("Barr"), the first on March 4, 2002 and the second on August 13, 2002, alleging Barr's infringement of Kos's separate patents for certain related drug products. This Court consolidated both actions into one (the "Complaint") by an Order dated September 23, 2002. Prior to the consolidation, Barr filed two nearly identical sets of counterclaims in opposition to each action and Kos filed two nearly identical motions, pursuant to Fed. R.Civ.P. 12(b)(1), to dismiss three of the counterclaims for lack of subject matter jurisdiction.[1] Because the Court found the two actions similar enough to consolidate, it also views the Counterclaims and the motions filed by Kos in response to be identical, and consequently treats Kos's separate motions as one (the "Motion") now before the Court. For the reasons described below, the Motion is DENIED.

## I. REGULATORY BACKGROUND

To fully understand this dispute requires an overview of the federal statutory framework governing new and generic drug approvals. Under the Federal Food, Drug, and Cosmetic Act ("FFDCA"), a pharmaceutical company seeking to manufacture a new drug is required to file a New Drug Application ("NDA") for consideration by the United States Food and Drug Administration ("FDA"). See 21 U.S.C. § 355(a) (1994). Preparing an NDA is often a time-intensive and costly process, in part because the NDA must contain detailed clinical studies of the drug's safety and efficacy and a list of patents which claim the drug. See id. § 355(b)(1) (Supp.1999). If the FDA approves the NDA, it lists the drug and corresponding patents on the drug's approved aspects in the FDA's publication "Approved Drug Products with Therapeutic Equivalence Evaluations," otherwise known as the "Orange Book." See id. § 355(j)(7)(A)(iii) (1994); id. § 355(b)(1).

In 1984, Congress passed the Hatch–Waxman Amendments (the "Amendments") to the FFDCA to provide an expedited approval process for a pharmaceutical manufacturer seeking approval to market a generic version of a previously approved drug. Instead of having to file a full NDA with new safety and efficacy studies, generic manufacturers were allowed to file an abbreviated new drug application ("ANDA") which could rely in part on the pioneer manufacturer's work by submitting data demonstrating the generic product's bioequivalence with the previously approved drug. See 21 U.S.C. § 355(j)(2)(A) (Supp.1999). The Amendments also aimed to ease patent infringement restrictions on those companies preparing an ANDA, creating a safe harbor for competitors to engage in otherwise infringing activities if those activities were done solely to prepare information needed to obtain FDA approval to market the

---

1. For purposes of clarity, the three counterclaims which are at issue in the motion before the Court, numbered V, VI and VII, are hereinafter referred to as the "Counterclaims."

generic product upon expiration of the underlying patents. *See* 35 U.S.C. § 271(e)(1) (Supp.1999). Without this safe harbor,

> a pioneer drug company's monopoly on its brand name drug was effectively extended to include not only the terms of any patents on the brand name drug, but also the time it took generic competitors to complete the NDA process after these patents had expired.

*aaiPharma, Inc. v. Thompson,* 296 F.3d 227, 231 (4th Cir.2002).

As part of the ANDA process, an applicant seeking to market a generic version of a listed drug must make a certification as to each patent listed in the Orange Book which "claims the listed drug ... or which claims a use for such listed drug for which the applicant is seeking approval." 21 U.S.C. § 355(j)(2)(A)(vii) (1994). Furthermore, an applicant whose ANDA is pending when a pioneer drug manufacturer lists additional patents in the Orange Book must make certifications as to the new patents, unless the additional patents are submitted more than thirty days after they were issued. *See* 21 C.F.R. § 314.94(a)(12)(vi) (2001). In either case, the applicant must certify either that: (I) no such patent information has been submitted to the FDA; (II) the patent has expired; (III) the patent is set to expire on a certain date; or (IV) such patent is invalid or will not be infringed by the manufacture, use, or sale of the new generic drug for which the ANDA is submitted. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(I-IV) (1994). These are commonly referred to as Paragraph I, II, III, and IV certifications.

When an ANDA contains a Paragraph IV certification, the ANDA applicant must give notice to the patentee and must provide detailed bases for its belief that the patent is invalid, unenforceable, or not infringed by the generic product. *See id.*

§ 355(j)(2)(B)(i);. 21 C.F.R. § 314.95(c)(6) (2001). The patentee is then given forty-five days to sue the ANDA applicant for infringement. *See* 21 U.S.C. § 355(j)(5)(B)(iii) (Supp.1999). If the patentee does not file suit, the application may be approved. If the patentee files suit within that period, the FDA may not approve the ANDA until the expiration of the patent, judicial resolution of the infringement suit, a judicial determination that the patent is invalid or unenforceable, or thirty months from the patentee's receipt of notice, whichever is earliest. *Id.;* 21 C.F.R. § 314.107(b)(1)(iv) (2001).

## II. FACTS

On January 15, 2002, Barr sent Kos a letter pursuant to 21 U.S.C. § 355(b)(3)(B) and 355(j)(2)(B)(ii) notifying Kos that Barr had filed an ANDA with the FDA seeking approval to market and sell a 1000 mg generic version of Niaspan, a Kos brand name product designed to treat patients with high cholesterol levels without exposing them to deleterious side effects, such as liver toxicity and treatment-limiting increases in glucose and uric acid levels. Barr's notice letter included a Paragraph IV certification stating that two of Kos's patents covering Niaspin—U.S. Patent Nos. 6,080,428 (the "'428 Patent") and 6,129,930 (the "'930 Patent," and together with the '428 Patent, the "Listed Patents")—are each invalid or unenforceable, or will not be infringed by the manufacture, use or sale of the generic version of Niaspan described in the Barr ANDA. Barr subsequently filed a second ANDA with the FDA seeking approval for the marketing of 750 mg and 500 mg strength versions of the same generic version of Niaspan.

As described above, Kos filed two actions in this Court against Barr—one relating to the 1000 mg product and the

other relating to the 750 mg and 500 mg product—for infringement of the Listed Patents. Barr in turn filed seven counterclaims against Kos.[2] Counterclaims VI and VII seek declaratory judgments stating that Barr's marketing of its generic version of Niaspan does not infringe two other Kos patents covering related products that were not mentioned in the Complaint—U.S. Patent Nos. 5,268,181 (the "'181 Patent") and 5,126,145 (the "'145 Patent," and together with the '181 Patent, the "Unlisted Patents"). Counterclaim V seeks a judgment declaring that the '181 Patent is invalid. At this stage of review, the three Counterclaims challenged by Kos must satisfy the same inquiry—whether in regard to each there is an actual controversy before the Court to allow the Court to consider them. Thus, the Court need only engage in a single analysis to resolve all of the Counterclaims.

## III. DISCUSSION

### A. STANDARD OF REVIEW

A party that makes a motion pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 (the "Act"), must demonstrate that the motion involves an actual case or controversy:

> The [Act] permits declaratory relief only in cases presenting 'actual controvers[ies],' ... a requirement that incorporates into the statute the case or controversy limitation on federal jurisdiction found in Article III of the Constitution.

*Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians,* 94 F.3d 747, 752 (2d Cir.1996) (quoting 28 U.S.C. § 2201(a)); *see also EMC Corp. v. Norand Corp.,* 89 F.3d 807, 810 (Fed.Cir.1996).

In a declaratory judgment case involving patent rights, an actual controversy arises where there is (1) "an explicit threat or other action" creating "a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit," and (2) "present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *BP Chemicals Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 978 (Fed.Cir.1993).

Determining the first prong of this test requires an objective analysis of Kos's conduct in order to ascertain whether Kos has shown an intent to enforce its patent rights. *See Shell Oil Co. v. Amoco Corp.,* 970 F.2d 885, 888 (Fed.Cir.1992). While such an intention is easily identifiable from express accusations of infringement and threats to bring suit, courts have found "reasonable apprehension ... may be induced by subtler conduct." *EMC,* 89 F.3d at 811; *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736 (Fed. Cir.1988) ("In light of the subtleties in lawyer language ... the courts have not required an express infringement charge."). In order to identify what kind of "subtle conduct" could create a reasonable apprehension of infringement litigation, courts have considered the "totality of the circumstances," *id.,* reviewing the full range of the patent holder's conduct to determine whether those actions, considered in context, create an objectively reasonable apprehension on the part of the potential infringer that the patent holder will file a lawsuit. *See Consac Indus., Inc. v. Nutramax Labs., Inc.,* No. 97 Civ. 1155, 1998 WL 229255, at *3 (E.D.N.Y. Mar. 31, 1998).

---

**2.** Counterclaims I–IV seek declaratory judgments that each Listed Patent is invalid and will not be infringed by Barr's ANDA. Because Kos did not seek dismissal of these counterclaims in the Motion, the Court shall not address them in this Decision and Order.

B. *REASONABLE APPREHENSION AND THE TOTALITY OF THE CIRCUMSTANCES*

In support of Barr's claim that it has a reasonable apprehension that Kos will sue it for infringement of the Unlisted Patents, Barr has offered three reasons: (i) prior lawsuits that Kos has filed against Barr; (ii) a public statement made by the Chief Executive Officer of Kos; and (iii) Kos's refusal to sign a covenant not to sue, as requested by Barr. Kos denies that any of these grounds gives Barr a reasonable apprehension of litigation, and additionally claims that there can be no reasonable apprehension on Barr's part because Kos has no standing to sue Barr with regard to the Unlisted Patents. The Court is persuaded that the totality of the circumstances, including consideration of Barr's reasons specified above, are sufficient to give rise to a reasonable apprehension that Barr potentially may face an infringement suit regarding the Unlisted Patents.

1. *Prior Litigation*

Kos has already demonstrated its readiness and inclination to sue Barr over its patents dealing with cholesterol products, as evidenced by its filing of the two actions at bar, and by its filing in this Court on November 12, 2002 of a third action, *Kos Pharmaceuticals, Inc. v. Barr Laboratories, Inc.*, No. 02 CV 8995, that concerns Barr's alleged infringement of another cholesterol patent substantially similar to Kos's Listed and Unlisted Patents. While a history of patent litigation by itself, even if between the same two parties, does not necessarily provide grounds for a reasonable apprehension by a potential infringer, *see Moore U.S.A. Inc. and Toppan Forms Co., Ltd. v. The Standard Register Co.*, No. 98 Civ. 485C, 2001 U.S. Dist. Lexis 21161, at *4–11 (W.D.N.Y.2001), such prior history does provide such grounds if the litigation between the parties involves the same technology as the patent that is the subject of the declaratory judgment action before the Court. *See Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 955 (Fed.Cir.1987) (finding prior state court litigation between the two parties relevant to patent litigation before the court because it involved a dispute over the same commercial technology generally covered by the patents); *Moore*, at *11 (finding that previous litigation between parties did not raise reasonable apprehension because it did not deal "broadly with the technology disclosed by" the patents at issue in the subsequent declaratory judgment action).

Indeed, in the instant case, the similarities between the Listed Patents currently being litigated in the Complaint and the Unlisted Patents cannot be ignored. The Listed Patents are described nearly identically as inventions designed to treat hyperlipidemia by utilizing a composition containing nicotinic acid and a time release process, which results in little or no liver damage. (United States Patent Number 6,080,428, dated June 27, 2000, and Number 6,129,930, dated October 10, 2000, attached as Exhibits E and F to Barr Laboratories' Memorandum Opposing Kos Pharmaceutical's Motion to Dismiss Declaratory Counterclaims for an Alleged Lack of Subject Matter Jurisdiction, dated September 26, 2002 ("Barr Memo").) Similarly, the '181 Patent is described as an invention designed to treat hyperlipidemia by releasing niacin (which the patent notes is another term for nicotinic acid) in a controlled method to avoid inducing hepatotoxicity (which is another term for damage to the liver), (United States Patent Number 5,268,181, dated December 7, 1993, Barr Memo Ex. D), while the '145 Patent is described as an invention covering a controlled release method for certain medicaments, of which niacin is one. (United States Patent Number 5,126,145, dated June 30, 1992, Barr Memo Ex. C.) Kos makes conclusory statements that the

claims of the Listed Patents are different from the claims of the Unlisted Patents, but offers no evidence or even any arguments as to how they are different.

From its reading of the patents, the Court is persuaded that the '181 Patent is not just similar, but nearly identical to the Listed Patents, and finds the '145 Patent to cover essentially the same scientific process as the Listed Patents. Based on the vigor that Kos has displayed in enforcing against Barr its rights under the Listed Patents, it is objectively reasonable to presume that Kos might pursue another course of litigation against Barr with regard to the substantially similar Unlisted Patents. *See SmithKline Beecham Corp. & Beecham Group v. Zenith Goldline Pharmaceuticals, Inc.,* No. 00 Civ. 1393, 2000 WL 963165, at *2 (E.D.Pa.2000).

### 2. *Public Statement*

Barr also asserts that a statement issued by Adrian Adams ("Adams"), President and Chief Executive Officer of Kos, in a March 4, 2002 press release, gives rise to Barr's reasonable apprehension of future litigation. Adams stated that Kos would "vigorously enforce [its] patent rights in order to protect Kos's cholesterol products, which [Kos has] effectively pioneered entirely on [its] own." (Barr Memo Ex. B.) Barr asserts that this statement, made in connection with the instant action on the day it was commenced, serves as an explicit threat that Kos will litigate over any cholesterol patent it owns, including the Unlisted Patents. Adams, in an affidavit filed with the Motion, attempts to defuse the comment by claiming that at the time he spoke, he was only referring to the Listed Patents, which were developed by Kos, and not the Unlisted Patents, which were developed by another pharmaceutical company, Upsher–Smith, and later purchased by Kos. (*See* Declaration of Adrian Adams in Support of Kos's Motion to Dismiss Barr's Counterclaims V, VI, and VII

for Lack of Subject Matter Jurisdiction, dated October 3, 2002.)

It is difficult for the Court to ascertain whether Adams's explanation is dispositive. According to Barr, the Unlisted Patents were purchased by Kos on January 9, 2002 (*see* Barr Laboratories' Answer, Affirmative Defenses, and Counterclaims to Complaint, dated September 3, 2002, ¶ 32), which would mean that at the time Adams made the statement, he probably was aware that Kos owned the Unlisted Patents. If so, it is fair to assume that his reference to protecting Kos's cholesterol patents would encompass the Unlisted Patents, which clearly deal with cholesterol products, as well as the Listed Patents. However, Adams does appear to modify the term "cholesterol products" by following with the clause: "which [Kos has] effectively pioneered entirely on [its] own." This clause lends some support, at least in a lawyer's semantic sense, to Adams's explanation because it appears to indicate that Adams is referring only to patents developed "entirely" by Kos, as opposed to ones developed elsewhere. But just as linguistically plausible, the adverb "effectively" may offer further modification, implying that while Kos was at the forefront in pioneering most of the technology involved with its cholesterol products, it is not responsible for all of the technology. Adams's use of the word "effectively," which Miriam–Webster's Dictionary defines as "virtually," *see* Miriam–Webster's Collegiate Dictionary 368 (10th ed.1993), leaves open the possibility that Adams intended to apply the same legal vigilance and enforcement with respect to protecting some of Kos's cholesterol products that were not pioneered by Kos, but were later incorporated into Kos's inventory of cholesterol patents.

Even putting aside the debate over Adams's choice of words, the Court is per-

suaded that a pledge by Kos's Chief Executive Officer to vigorously enforce Kos's cholesterol patents would not exclude certain patents owned by Kos merely because such patents were not actually developed by Kos but were instead acquired from another source. It is reasonable to assume that Kos may have bought these patents, despite their striking similarity to patents Kos already owned, to use them as a means to protect Kos's exclusive rights to produce Niaspan. Nothing prevents Kos from enforcing the Unlisted Patents to do just that. Indeed, such enforcement would make strong business sense, especially if it serves to protect a product that in 2001 accounted for $84 million in sales. (Barr Memo Ex. B.)

### 3. *Covenant Not to Sue*

Barr also claims that Kos's refusal to sign a covenant not to sue with regard to the Unlisted Patents demonstrates that Kos still leaves open the possibility of eventually suing over the Unlisted Patents. The Court takes this factor into account, as "a patentee's refusal to give assurances that it will not enforce its patent is relevant to the determination [of whether a reasonable apprehension exists, although] . . . not dispositive." *BP Chemicals Ltd.*, 4 F.3d at 980. While another court in this Circuit found the refusal to grant such a covenant insufficient to render a potential infringer's apprehension reasonable, *see Moore*, at *12, the situation here is distinct. In *Moore*, the court did not find sufficient similarities between the patent that was the subject of the initial litigation and the patent that was the subject of the defendant's declaratory judgment action, and about which the defendant asked for a covenant not to sue. *See id.*, at *13–14. Thus, the court found it unnecessary for the patentee to sign a covenant not to sue on the patent at issue in the declaratory judgment action because the pending litigation was about a patent that covered a

different type of product, *see id.*, at *14 & n. 5, and the court was not convinced that the patentee "would likely follow an unsuccessful enforcement of the [patent at issue in the litigation] against [the alleged infringer] with a similar attempt at enforcing the [patent at issue in the declaratory judgment action]." *Id.*, at *14. In the instant case, the Court finds the Unlisted and Listed Patents to be very similar, and therefore is persuaded that the risk of future litigation over the Unlisted Patents is real, and thus lends added grounds to support Barr's reasonable apprehension.

### 4. *Standing to Sue*

Kos is correct in claiming that it cannot sue Barr for infringement on the basis of the Unlisted Patents because such patents are not currently listed in the Orange Book. *See Abbott Labs. v. Zenith Labs., Inc.*, No. 94 Civ. 6792, 1995 WL 117984, at *12 (N.D.Ill.1995). However, there is nothing to prevent Kos from listing the Unlisted Patents in the Orange Book in the future, and then suing Barr on the basis of those newly listed patents. Indeed, it is in Kos's interest to keep the Unlisted Patents out of the Orange Book until the litigation over the Listed Patents is resolved, then list them in an effort to further delay Barr's entry into the market with a generic version of Niaspan. Thus, the Court finds Kos's argument to be irrelevant to any reasonable apprehension on Barr's part.

### C. *PRESENT ACTIVITY*

■ Determining the second prong of the test to determine the existence of an actual controversy requires examining whether the potential infringer has taken concrete steps to perform an infringing act. While Kos denies that Barr has taken such steps, this Court is persuaded that Barr's actions in developing a generic Niaspan and in applying for FDA approval

sufficiently demonstrate Barr's intent to bring a generic Niaspan to market in some form. Kos would have the Court believe that Barr has spent in excess of $2.3 million over two years to produce two ANDAs spanning more than 12,000 pages, (Barr Memo Ex. A), yet has no intention of ever producing a product covered by those AN-DAs. Indeed, Barr predicts it will obtain tentative FDA approval of both ANDA's by March of 2003, (Barr Memo Ex. A), meaning the prospect of Barr entering the marketplace with its generic Niaspan product is imminent, and not "years away." *Telectronics Pacing Systems, Inc. v. Ventritex, Inc.,* 982 F.2d 1520, 1527 (Fed.Cir.1992) (noting that a party seeking declaratory judgment could not meet actual controversy requirement because its product was just beginning clinical trials and was years away from FDA approval). Kos itself refers to one court's decision as finding FDA approval to be imminent, (*see* Kos' Reply Memorandum in Support of Its Motion to Dismiss Barr's Counterclaims V, VI and VII for Lack of Subject Matter Jurisdiction, dated October 3, 2002, at 8), yet that court assumed FDA approval was sixteen months away. *See Glaxo Group Ltd. v. Apotex, Inc.,* 130 F.Supp.2d 1006, 1009 (N.D.Ill.2001). Even assuming Barr has underestimated by a year the length of time it will take to obtain approval, that timeframe still falls comfortably within Kos's own definition of imminent approval. Thus, while Barr may not have the present ability to market a generic Niaspan, it has embarked upon a protracted and costly process of obtaining regulatory approval, and this conduct illustrates the kind of "concrete steps" or "meaningful preparation" needed to establish an actual controversy under "all the circumstances." *Infinitech, Inc. v. Vitrophage, Inc.,* 842 F.Supp. 332, 337–38 (N.D.Ill.1994). While Kos cites other cases where the potential infringer was far more along in its production, *see, e.g., Biogen, Inc. v. Schering AG,* 954 F.Supp. 391, 396 (D.Mass.1996) (noting that the alleged infringer had actually produced the product for sale and stockpiled it in preparation for marketing), none of the cited cases offers as a decisive threshold a minimum amount of production that a potential patent violator must reach in order to demonstrate sufficient ability to infringe. The Court is not persuaded that as the only compelling standard to establish a controversy, Barr should be required to spend, beyond the amounts it already has incurred to date to pursue development of the product in question, additional millions of dollars on production, particularly considering that FDA approval and the litigation now before this Court present significant hurdles for Barr and render prospects for actual sales of its generic version of Niaspan unforeseeable.

## IV. *ORDER*

For the reasons set forth above, it is hereby

**ORDERED** that plaintiff Kos Pharmaceuticals's motion to dismiss defendant Barr Laboratories's counterclaims V, VI and VII is denied.

**SO ORDERED.**